# THE FAST BEARING CO. *v.* PRECISION DEVELOPMENT CO.

### [No. 25, October Term, 1945.]

*Decided November 29, 1945.*

See also· 183 Md. 399, 37 A. 2d 905.

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Frederick W. C. Webb,* with whom were *Woodcock, Webb, Bounds & Travers* on the brief, for the Fast Bearing Company.

*Hilary W. Gans,* with whom was *Stanley G. Robins* on the brief, for the Precision Development Company.

MARBURY, C. J., delivered the opinion of the Court.

This is a suit brought on December 29, 1943, by the appellant, the Fast Bearing Company, a corporation, hereinafter called Fast, against Precision Development Company, a corporation, hereinafter called Precision, for the breach of an agreement between them, dated

March 23, 1942. This agreement recites that Fast owns certain patents and patent applications for multiple oil film bearing units which Precision desires to manufacture, and that Fast grants to Precision the exclusive license to manufacture, use and vend the same under its patents for which Precision is to pay certain royalties or rents, calculated on the amount of gross sales, with an option to purchase the patents for the sum of $1,000,000. If any of the royalties are in arrears for thirty days, Fast can revoke the license. Section 16 of the agreement states that it is agreed as a condition precedent to its making that Precision will "at all times during the life of this agreement and in good faith use reasonable efforts to promote, manufacture and sell the articles hereby licensed, or to be licensed to it, and will likewise encourage the use and adoption thereof in preference to any other type of multiple oil film bearing." And it is further provided in this section that upon failure of Precision to use such reasonable efforts or to manufacture on a production basis and to list and offer for sale in the regular and customary manner for a period of six months, bearing units on which royalty is required to be paid, Fast shall have the right and option, upon sixty days' notice, to revoke Precision's license. Section 17 provides that Fast shall have no right to cancel the agreement because of the alleged breach by Precision in respect of Precision's failure to comply with Section 16, or to pay the royalties provided "in the event that such alleged breach is caused by any mandatory order, demand, or requisition of the United States Government acting through any of its agencies or because of any act of God, condition of war, interference with production because of strikes, fires or other causes beyond the control of the licensee." Section 20 provides that unless canceled by Fast 'for cause, or unless surrendered by Precision within thirty days of its date, the agreement is to remain in full force and effect until the last day of December, 1946, and thereafter is to continue from year to year unless Precision gives six months' notice of its

intention to terminate prior to the expiration of the calendar year.

The declaration contains the common counts and a special second count which alleges that the agreement was not canceled within thirty days and has never been canceled by either party except for an attempt by Precision, on April 19, 1943, through a letter to the effect that it did not intend to exercise any of the rights granted it, but this cancellation was not acquiesced in by plaintiff. The declaration further alleges that Precision, since the execution of the license agreement, has not in good faith used and has refused and failed to use reasonable efforts to promote, manufacture and sell the Fast bearings covered by the patents to the United States of America, and to other present and prospective users, and has refused to encourage the use of Fast bearings and has manufactured and sold only a negligible number thereof, but has promoted and manufactured at its plant, and sold and encouraged the use and adoption of other types of multiple oil film bearings competitive to Fast bearings, and has ignored and failed to perform the obligations imposed upon it by the agreement. That performance, in good faith of such obligations, would have resulted in sales of large numbers of said bearings to the United States and to other present and prospective users, and such sales would have yielded plaintiff large sums of money, and thereby the plaintiff has suffered great loss and damage, which it claims amounts to one million dollars.

The case was tried before two judges without a jury. They found that there were $616 in royalties due Fast for bearings actually manufactured. They disallowed all other claims on the ground that the Navy Department prevented Precision from manufacturing these bearings, and therefore Precision was not liable for its failure to do so. As a result a verdict and judgment were entered in favor of Fast against Precision for $616. From this judgment, Fast appealed and Precision filed a cross-appeal.

Precision's appeal is not from the amount of the judgment which it does not contest. It is based upon the fact that the trial judges, in their opinion, stated that there was a suspension of the activities of Precision necessitated by the urgent needs of the Navy Department. Precision contends that the facts found by the judges not only excused its failure to manufacture the bearings, but entitled it to terminate the license agreement and the judges should have so stated. As this case is a law case in which the result must be a judgment for either the plaintiff or the defendant, and as there is no place in a judgment for such a declaration as Precision wishes, it is apparent that its appeal is from the opinion and not from the judgment. Such an appeal cannot be allowed, since the opinion is no part of the judgment. This is not changed by Part III, Rule 9 of the Rules Applicable to Law Only of the General Rules of Practice and Procedure adopted by this Court. That rule provides that when any proceeding at law is tried upon the facts by the Court, there shall be filed a brief statement of the grounds for the Court's decision, and upon appeal this Court may review both the law and the evidence. There is, however, nothing in this rule authorizing us to entertain an appeal from anything in the statement of facts. The appeal must be from the judgment. Under these circumstances, the appeal of Precision must be dismissed.

Fast's appeal is based upon the failure of the Court to allow any damages under the second count in the declaration. It claims that this is wrong because (1) Precision did not intend to perform its obligation under the license agreement either at the time it executed that agreement or at any time thereafter, and that its only object in making the agreement was to secure completion, by the Navy, of the plant in which the bearings were to be manufactured; in other words, that there was fraud at the inception of the agreement and, (2) that the agreement was breached by Precision when it refused to provide bearings for test by the Navy Depart-

ment by April 23, 1942, and when it sold some of the machinery specially designed and adapted for the manufacture of Fast bearings, and the tools and steel, thereby divesting itself of the essential means of such manufacture, and when it notified Fast by letter of April 19, 1943, that it did not intend at any time thereafter to exercise its rights under the license agreement.

As we stated at the outset, this is a suit for breach of contract. It is not a proceeding to avoid the contract for fraud in its inception, nor is it an action of deceit based upon such fraud. The evidence produced by Fast to uphold its first contention is, therefore, only relevant to show that Precision's actions after the contract was signed were a result of its own fraudulent intention never to carry out its agreement, and were not the result of other conditions beyond its control. It may also be pertinent against the defense of impossibility or performance, if it shows that Precision knew of the Navy's determination not to use Fast bearings without a test before the signing of the contract. The real questions in the case are, was the contract breached by Precision, if so, why, and what damage was suffered by Fast as a result. In the consideration of these questions we turn to the evidence.

In 1941, Precision, which was a subsidiary of Socony Vacuum Oil Company and Sun Oil Company, and Martin and Schwarz, also a subsidiary of these companies, had arranged for the construction of a plant for the manufacture of gasoline dispensing pumps, such new plant to be erected on College Avenue, Salisbury, Maryland. They both planned to move to the new Precision building when erected. Socony Vacuum, however, opposed the construction of this building, and only the front of it was built. In January, 1942, a Mr. Rigterink, who was a war contact man of Precision, called on Mr. Fast, the president of Fast, and said that Martin and Schwarz had been instructed by the Government to engage in war work, and had been referred to Mr. Fast as the owner of machinery, tools and equipment which Pre-

cision might purchase for use in a war project. From that interview grew negotiations for the manufacture of Fast bearings by Precision, and a joint effort was made by the two companies to interest the Navy Department in the use of such bearings on naval vessels. These bearings had previously been tested by the Navy Department Experimental Staff and had been approved for Navy use. Commander Lee, in the Bureau of Ships, to whom the representatives of the two companies were referred by the Navy Department officials, became interested in the use of the bearings on propeller shafts in the destroyer escort program which was then under consideration. He was advised that Precision would want the Navy to furnish additional facilities if it was to undertake the manufacture of Fast bearings for such use, and told Precision that the Navy would provide those facilities if the bearings met with the approval of the Naval architects, and he suggested that Mr. Fast and Mr. Rigterink call upon them, which they did. They went to Salisbury to determine what actual facilities Precision would need, and there they met Mr. Bateman who was the president of Precision. Fast suggested that a certain structure in Salisbury known as the Jackson Shirt Factory would be suitable and would avoid the necessity of the Navy adding to the Precision plant, but Mr. Bateman said he would not go through with the plans unless the Navy would provide an addition to the Precision plant. There is also some testimony that Mr. Pew, Chairman of the Board of Precision, expressed the thought that such addition could be bought from the Navy after the war for a song. On February 3, 1942, Commander Lee arranged a hearing by the Shore Facilities Section of the Bureau of Ships, so that it could be determined whether or not the Navy should supply the facilities desired by Precision, including the addition to Precision plant. The hearing was held on February 4th. Mr. Bateman testified that Precision proposed to manufacture Fast bearings and Fast couplings and needed for that purpose the additional structure and certain

machinery and equipment to supplement that owned by Precision and that which it proposed to acquire from Fast. It was there developed that the facilities could be provided by the Navy and might be used for other things. In the same month, certain Salisbury people made objections to the Navy Department to the furnishing of money by the Navy for the additional structure, claiming, as had Mr. Fast, that the program could be carried on at the Jackson Shirt Factory. However, towards the last of February Precision learned that the Navy would provide the facilities applied for, including the plant addition. About that time Rigterink began the investigation of Fast bearings from some of the users, included among others, Bartlett Hayward Company and Koppers Company, Baltimore. The Koppers Company had had a suit with Fast, involving the lease of machinery, which suit Fast had won in this Court. See *Fast Bearing Co. v. Koppers Co.*, 181 Md. 203, 29 A. 2d 289. Rigterink testified that he got good reports from several users, but that a Mr. Perkins of Koppers Company told him that Fast was no good and that his bearing was no good. This information was not given to Fast, nor, according to Precision's testimony, was it given to the Navy Department. Mr. Bateman did, however, say that they thought it was more or less up to the Navy Department to make the decision "with their eyes open" as to what they would do about the bearings. Fast suspects that some adverse information was given to the Navy Department by Precision, because, about the time that Perkins made his statement, Commander Lee was informed by the Navy Design Division that Fast bearings did not have a clear operating record, and they opposed their use in the destroyer escort program. Commander Lee said that a question as to the use of Fast bearings in the program first occurred in that manner, so far as he knew. On March 12, 1942, Commander Lee wrote a letter to the War Production Board that in going ahead with the facilities contract with the Precision Development Company, the Bureau of Ships was guided by the need for

self-aligning shaft bearings, Fast type couplings, Kingsbury thrust bearings and special types of speed reducing housings. The letter states that the tools held in storage by Mr. Fast, plus those to be supplied under the facilities contract to round out the tool equipment in the shop, will make it possible for the Precision Company to produce units of the type outlined in substantial quantities. Commander Lee also states in his letter that it is difficult for the Bureau to make any definite statement with regard to the total orders to be placed with the company for any particular unit, but it is hoped that they will manufacture line shaft bearings for all ships of the destroyer type, and in addition, that there is an acute shortage of Kingsbury type thrust bearings, and it is expected that this company will be called on by other manufacturers to supply them with these units, and that the same is true of Fast type couplings. It is obvious from this letter that, at that time, the Navy intended that the plant should be used for the manufacture of articles other than Fast bearings and couplings. Meanwhile, the negotiations between Precision and Fast were going on, and by February 26, 1942, contracts between them were agreed upon, and on that date were executed by Fast and sent to Precision. One of these contracts was the original draft of the one in question in this case, and another related to the purchase by Precision of Fast machinery, equipment and steel. This last contract was before this Court in the case of *Precision Development Co. v. Fast Bearing Co.*, 183 Md. 399, 37 A. 2d 905. That was a suit for the purchase price of the machinery, and a judgment of $98,439.41 in favor of Fast was affirmed. On March 19, 1942, Fast was advised that Bateman had on that day accepted the Navy letter of intent, and that he requested Fast to execute and send the revised license agreement to Bateman at once, and that Mr. J. Edgar Pew, one of the officials of the Sun Oil Company wanted to see Mr. Fast on the following day. The Navy letter of intent was dated March 4, 1942, was addressed to Precision, and was signed by the Chief of

the Bureau of Ships. It stated that it had been deemed essential to the prosecution of the war that industrial plant facilities having an estimated cost of $213,500 be provided as an addition to Precision's existing plant at Salisbury "to enable you to produce Fast bearings and couplings which are to be used in the building of escort vessels necessary for the war effort." The schedule in the letter was that the extension to the plant was to cost $120,000; railroad sidings, etc., to cost $5,400, and the balance, except a reserve of $19,060 for contingencies, was to be used for machinery. Mr. Fast executed the agreement, which is the one sued on here, on March 19, 1942, and forwarded it, and on March 20th went to Philadelphia and saw Mr. Pew.

There is a difference in the testimony as to what occurred at this interview on March 20th. Mr. Fast said that Mr. Pew informed him that he had bad news for him; that he said that the Navy was not going to use Fast bearings; that the Navy wanted Precision to guarantee the bearings, but Precision was unable to do so. Mr. Fast said he told Mr. Pew that he had information that he could obtain an agreement from the Navy to test the bearings at sea, and that Mr. Pew stated that he would have his full cooperation in respect to the bearings if Mr. Fast succeeded. Mr. Pew did not testify as to this converation, although he was in Court. Mr. Bateman testified that he didn't remember exactly when the conference was, but his recollection was that Mr. Fast was interested in having Precision guarantee the performance of his bearings, but finally agreed that it would be poor policy. Commander Lee testified that it was decided by him, after discussing the matter with the members of the design division of the Bureau of Ships, that his early decision to use Fast bearings in the escort program was unwise. Several of the officials opposed it, and sometime in March he notified Mr. Fast and Precision, at relatively the same time, within two or three days, that he had so changed his decision. Mr. Fast stated that he had a conference with Commander Lee

on March 26, 1942, and that Commander Lee said, that, without a guarantee, the Navy could not accept any equipment, and that Mr. Pew and Mr. Bateman had refused to guarantee it. He also testified that Commander Lee said that he would be willing to authorize a full scale test of one of the bearings and would put at Mr. Fast's disposal a couple of Navy ships so that he could give the bearing a sea-going test. Commander Lee, in his testimony, said that he did not recall Mr. Fast saying that Mr. Pew had refused this guarantee for bearings, and did not confirm the statement that Mr. Pew and Mr. Bateman had been to see him, but said that he had never seen Mr. Pew in his life; that to the best of his knowledge the question of a guarantee on these bearings was never raised with him by anybody, and that such a guarantee was absolutely of no importance in respect to the decision not to use them; that a guarantee of the bearings for the ships, while it might have paid for the bearing had it failed, could not have made up for what would probably have happened in 1943 had these ships been made non-operative due to the failure of the bearing. Commander Lee further said that the final decision was made in the Bureau of Ships, uninfluenced by any representative of Precision or Mr. Fast. Commander or Captain Lee (he had been promoted at the time of his testimony) stated that he told Mr. Fast when he communicated the decision of his department to him, that it was not a prudent thing for the Bureau to install a bearing in the ships involving the destroyer escort program until the bearing had undergone tests at sea, and that he proposed that certain of the bearings be installed in some old ships, and Mr. Fast seemed quite satisfied with these arrangements. Captain Lee further testified that the destroyer escort program covered the latter months of 1941, all of 1942 and all of 1943, but due to the overcoming of the submarine menace in the latter months of 1943, the emphasis was taken off the ships as of January, 1944. Captain Lee further testified that as the bearing was not in existence on September 5, 1942,

when the Fast Bearing Company's final plan for a pro-
posed test bearing was sent to Gibbs and Cox, the Naval
architects, it would require approximately three months
to produce the bearing and the Navy would have desired
at least a six-month test of the bearing at sea, which
would make nine or more months before the approval
of the bearing could have been given. This would be,
certainly, the middle of 1943. He had that length of
test in his mind when he discussed the matter with Mr.
Fast, and Mr. Fast knew what he was talking about.
He was asked whether or not it was the intent of the
department to have the facilities wait until the test was
made, and he said "No." He made arrangements for
Precision to visit the Kingsbury Thrust Company to see
if they could make thrust bearings, which were used
on the destroyer escort program, and the facilities fur-
nished Precision were utilized for that purpose; that
the Navy would require Precision to use the facilities as
directed by the Bureau of Ships. The facilities were
the property of the United States Government and were
to be used as directed by the authorized agent of that
Government, and that his request to Precision to work
with Kingsbury was an order. The facilities were
equipped to make this type of bearing. He further stated
that the approval of the Department of a particular
bearing and a particular program meant generally, sub-
ject to the supply, only that that bearing was subject to
the competition of any other bearing which had likewise
been approved by the Department for use in the same
program. On March 23, 1942, three days after the date
fixed by Mr. Fast of the interview in Philadelphia, and
after Mr. Pew had allegedly told Mr. Fast the Navy
would not use Fast bearings, the license agreement was
executed by Precision. A former employee of Martin
& Schwarz testified that around March 1st he and other
employees knew Precision "had abandoned all ideas of
manufacturing Fast bearings because it was too ex-
pensive to tool up." It may be noted here that test bear-
ings could not be made until the machinery which was

being acquired from the Government under the facilities contract was actually installed, and it was not actually installed until April, 1943. Captain Lee testified that the design of the bearing had to be determined in the latter part of March or April, 1942, so that the Naval architects could invite bids, and that the design was selected prior to April 11, 1942.

Mr. Fast testified that he received the executed agreement sued on through the mail on March 24, 1942, and on the same day Mr. Bateman called him on the phone and asked him to meet Mr. Bateman in Salisbury on the following day to arrange for the building of the test bearing. He agreed and went to Salisbury on the 25th, but when he arrived at the plant of Martin & Schwarz he was told that Mr. Bateman had been there, but had left. He saw Mr. Nelson and a Mr. Schaeffer, General Superintendent of Precision (now deceased). They said, according to Mr. Fast's testimony, that they had been told by Mr. Bateman to forget the Fast bearing, the Navy doesn't want it and we are not going to build it. They were then working on another bearing of which they had a set of drawings from Gibbs & Cox, the Navy architects.

Mr. Fast, in addition to the two agreements mentioned, had a personal employment agreement with Precision also dated March 23, 1942, for a period of two years at a salary of $10,000 a year. He started his work in Salisbury pursuant to that agreement on April 6, 1942. No one at Precision at that time, seemed to him to know anything about the manufacture of Fast bearings. However, he proceeded to complete his design of the bearings. At the same time, work was being done at the plant by other people, without his knowledge, on the other bearing, which Gibbs & Cox had approved. By April 23, 1942, Mr. Fast testified he had completed arrangements for tests at the Naval Experimental Station at Annapolis and for sea tests. When this was told Mr. Bateman on the 23rd and he was shown letters to Fast Bearing Company from the Navy Department and the Experimental Station at An-

napolis, Mr. Fast said Mr. Bateman said, "I have not heard from Commander Lee and unless I get an order to build the test bearing I am not going to build it." He further said that he was not going to build the test bearing at his own expense, but hoped the Navy would pay for it. Mr. Fast told him the Navy never did this. Mr. Bateman still declined to consider it, and from that time on Mr. Fast was unable to get anything definite from him about proceeding with the manufacture of the bearings. It appears from the record that on March 26, 1942, Mr. Fast wrote to Gibbs & Cox enclosing blue prints showing a proposed bearing. A reply was received on May 5, 1942, making certain criticisms, and on May 11, 1942, Mr. Fast replied stating that he was revising the design in accordance with their suggestions, and on May 15th he sent up a revised plan. On September 5, 1942, he sent up another revised plan, but even then it does not appear that Gibbs & Cox approved them. Mr. Bateman testified that he did not feel justified in view of the uncertainty of the use of the bearings by the Navy, in incurring an expense which he estimated would be as much as $20,000 to manufacture the test bearing. (Mr. Fast estimates the cost at $7,500.) Precision Company could not make them because the machinery had not been installed. After the machinery was installed, the company, at the direction of the Navy, was making Kingsbury bearings and could not have made Fast bearings without destroying that production.

Without detailing other items in the testimony, it would perhaps serve the purposes of this opinion to state how Fast sums up the circumstances upon which it bases its contention that Precision never intended to make Fast bearings. We quote from appellant's brief:

"(1) Precision, from the first was interested in a contractual relationship with Fast only if the Navy would build the addition to its plant which it planned in 1941 for the manufacture of gasoline dispensing pumps but Socony-Vacuum blocked. (2) As soon as the Navy became committed to that construction in late February,

1942, it is now obvious, Precision noticeably lost all interest in Fast bearings and has never since changed its attitude. (3) When the addition by the Navy had about become an accomplished fact in the Spring of 1943, Precision totally repudiated the license agreement involved in this case. (4) Precision has succeeded in obtaining the addition to its small plant, without financial aid by one of its parents, Socony-Vacuum, which Bateman planned in 1941 but Socony-Vacuum opposed. (5) Precision, according to Major Pew, expects to purchase the plant at the War's end 'for a song,' a windfall not improbable under the terms of the Navy Facilities Contract and in the inevitable confusion and scramble in the Government's efforts after the war to dispose of surplus property. (6) Precision has profited from the Fast transactions by a $270,000 addition to its plant, and, at Fast's expense, to the extent of $35,000 on the machinery and equipment acquired from Fast."

The chief basis for this contention of Fast is the idea, founded largely on a matter of timing, that Precision communicated to the Navy Department that adverse criticism of an employee of the Koppers Company. There is no shred of direct evidence that this comment was ever relayed by Precision or any of its officials to the Government authorities, and Commander Lee denies that a decision not to use Fast bearings until they had a sea test was influenced by anything outside the Department at all, except that the Navy Design Division had ascertained that Fast bearings did not have a clear operating record. The statement by the former employee that as early as March 1st, it was known that Precision was not going to manufacture Fast bearings because of their cost, was not corroborated. Another statement attributed by the same employee to one of the officials of Precision that he did not know why Mr. Bateman kept on telling lies to Mr. Fast, was emphatically denied by the official. While the facilities furnished by the Navy seemed to have been originally contemplated for the construction of Fast bearings, nevertheless, as early as March 12,

1942, the War Production Board was notified by the Navy that there were other things to be produced there, among them Kingsbury bearings. The plant was not ready to produce until April, 1943, and from that time on its facilities were being used, under the order of the Navy, to produce other bearings. If it is true that Mr. Fast was told on March 20, 1942, that the Navy was not going to use his bearings, he had that information from Precision prior to the final execution of the contract. He could have withdrawn his signature, until it was established whether his bearings were to be used. He did not, of course, because he hoped that he could overcome the opposition of the Bureau of Ships by having a sea test made. His idea of a sea test seems to have been very different from that of the Navy. Precision seemed to have had the idea that the Navy would pay for the bearings for the sea test, and declined to use its own funds for the purpose. It continued to use the facilities furnished it by the Navy from the time they were installed until the institution of this suit (the evidence shows until the date of the trial) in the carrying out of Naval contracts for other bearings. Its contention, which seems to be supported by the evidence, is that it could not manufacture Fast bearings for other customers, if there were any, at least until it had completed these contracts. On April 19, 1943, Precision notified Fast by letter, signed by Mr. Bateman, that on that date it "permanently ceased operations" under the agreement of March 23, 1942, and that "Precision Development Company does not intend to exercise at any time any of the rights granted to it as licensee under said agreement." Mr. Bateman testified that this letter was sent to provide Mr. Fast with an opportunity to cancel the agreement.

There are a number of other items of testimony, in addition to these related, which Fast relies upon to support its conclusion that there was bad faith and fraud in the inception of the contract on the part of Precision. The record on this appeal is very large, the printed portions in the respective appendices total 792 printed pages,

and the briefs, enlarged by leave of Court, add 179 more. Mere bulk in the papers submitted to the Court does not, however, justify a greater elaboration of the evidence in this opinion. It is sufficient to say that we have set out herein the most pertinent parts, and have valued the rest with respect to the several contentions made.

We agree with the conclusion of the trial judges that Fast has failed to meet the burden of proving bad faith in the inception of the contract. There is ground for finding that, after the contract was executed, and after it was found that a sea test would have to be held at its expense before Fast bearings would be put on the Navy list, Precision lost interest in the Fast products, and turned its attention to other bearings which it could manufacture for the Navy. Even if both parties knew there were difficulties in the way on March 20, 1942, as earnestly contended by Fast, but not admitted by Precision, the execution of the contract after that date is not evidence, in our opinion, of bad faith, but rather of hope that the way would be cleared of trouble. Nor do we think it is proven that Precision knew, before signing the contract, that the Navy would not use Fast bearings.

This brings us to the consideration of the obligations of Precision under its contract, and its actions, after it found what was the actual situation with the Navy. In the consideration of those questions, it must be borne in mind that both parties testified that the contract, although only inferentially mentioning government orders, would not have been executed by either except for the hope of getting Navy contracts. And it is a reasonable holding that the unbiased testimony of Captain Lee, an impartial witness, should be accepted as showing what the position of the Navy was, respecting the Fast bearings.

Here we have an inventor, without adequate finances to market his product, entering into a contract with a manufacturer of ample resources (potentially at least) to produce and sell the articles which the inventor has patented, on a royalty basis. There is no minimum royalty provided for, but the inventor is protected by para-

graph 16, already quoted, which gives him the right to revoke the license to manufacture if proper efforts are not made by the manufacturer or if royalty-paying bearings are not manufactured on a production basis for a period of six months. The efforts the manufacturer has to make are defined as "reasonable efforts to promote, manufacture and sell" the licensed articles and to encourage the use and adoption thereof "in preference to any other type of multiple oil film bearing." The rights of cancellation are distinct, so that even if the manufacturer makes the proper efforts the inventor has the right to cancel, if there is a failure for six months to manufacture on a production basis. The manufacturer is protected in paragraph 17 which will be hereafter discussed.

The manufacturer has not sufficient facilities to produce the articles contracted for, but has to use, in addition, facilities furnished by the United States Government, which facilities the Navy controls. It is met, therefore, with two questions when it is asked to manufacture bearings for a sea test. Is it required by its contract to expend the necessary amount to make these bearings under the circumstances? And is it in a position to do so under its arrangement with the Navy?

What are the circumstances? The Navy wants a test which will take nine months—three to make the bearings, and six to test them at sea. The cost is somewhere between $7,500 and $20,000. The result of the test, if favorable, will be that the bearings will go on an approved list, to be subject to competitive bidding against other bearings. There is no certainty that they will ever be selected for use on any Navy units. Moreover, the plant is not completed until April, 1943, so the bearings cannot be started until then. And when the plant is completed, the Navy orders its use for other purposes, and up until the time of the trial of this case, it is being so used.

Section 17 of the agreement provides that Fast may not cancel for an alleged breach in respect of failure to

comply with Section 16 "in the event such alleged breach is caused by any mandatory order, demand or requisition of the United States Government acting through any of its agencies, or because of any * * * condition of war * * * or other causes beyond the control of the licensee."

The question whether or not Precision was required by its agreement to have the bearings made for the necessary sea tests depends on the determination of what are "reasonable efforts" as set out in that agreement. But it does not seem to us to be necessary to decide this, because Section 17 clearly excuses cancellation for any alleged breach caused by the orders and requisitions of the Navy Department. Here we have Precision ordered to use the Navy facilities to make other bearings. If Fast could not cancel for an alleged breach caused by the Navy, it would be hardly within the contemplation of the parties that he could sue for damages. We therefore hold that such a damage suit is barred by the terms of the contract itself. The question is not before us, whether Section 17 prevents revocation (without suit for damages) for failure to manufacture on a production basis.

It may also be noted that the Second War Powers Act, under which the facilities were controlled by the Navy Department, Act of March 27, 1942, Chap. 199, 56 Stat. 176, 50 U. S. C. A. Appendix, Sec. 631, *et seq.*, provides that no person shall be held liable for damages for any default under any contract which shall result directly or indirectly from compliance with the sub-section giving the Secretary of the Navy authority to make contracts for the construction of naval vessels and establishing priority for such contracts over deliveries for private account.

The specific terms of the contract itself make inapplicable the implicit doctrine that impossibility of performance, due to governmental interference after the contract is executed, is a valid defense to an action for breach of contract. In the case of *Wischhusen v. Spirits*

*Co.,* 163 Md. 565, 568, 163 A. 685, 687, the United States Government refused to issue a permit to the defendant corporation to carry on the business of distilling whiskey, so long as the plaintiff, whom the Government did not regard as trustworthy or competent, was employed as manager. As a result, the company was obliged to dismiss him, and he sued for breach of contract. This Court said, "The general rule with respect to contracts is generally stated to be that, when the impossibility of performance arises after the formation of the contract, the failure of the promisor to perform is not excused * * * upon the theory that, if the promisor makes his promise unconditionally, he takes the risk of being held liable even though performance should become impossible by circumstances beyond his control. * * * The unfair consequences of this rule resulted in exceptions when the impossibility arises (1) either from a change in domestic law or by an executive or administrative order * * *." In that case there was quoted with approval, *Restatement of the Law of Contracts,* Volume 2, page 852, Section 458, where it is stated, "A contractual duty * * * is discharged * * * where performance is subsequently prevented * * * (a) by the Constitution or a statute of the United States * * * (b) by a judicial, executive or administrative order made with due authority by a judge or other officer of the United States * * *." In the case of *Texas Co. v. Hogarth Shipping Corp.,* 256 U. S. 619, 65 L. Ed. 1123, which was an admiralty case, an effort was made to recover damages for a breach of a charter party between the respondent, a British corporation and the defendant, a petroleum corporation. The British company, in accordance with the charter party, named certain ships to be used, but while one of these ships was being provisioned for the intended voyage, on April 10, 1915, and while it was still in British waters, it was requisitioned by the British government and pressed into its war service. The Court said that compliance with the charter party was made impossible by an act of state (in this

case of a foreign state) and therefore it became impossible of performance, and the defendant was absolved from liability. And in *Williston on Contracts*, Revised Edition of 1938, Vol. 6, paragraph 1938, pages 5427, 5428, it is stated, "Under statutes passed during the World War a number of cases of this sort arose * * * contracts to sell or to manufacture goods, where the goods or all goods manufactured at the seller's factory are afterwards requisitioned by the government, and contracts of other kinds, were invalidated by statute or executive orders because of the exigencies of war and the promisors held free from liability for not keeping their contracts."

The sale of the specially designed machinery and the tools and raw steel, mentioned as another breach of the contract, might be evidence that Precision did not intend to manufacture Fast bearings, although it did manufacture those on which the judgment allowed royalties. However, such sale did not prevent compliance with the contract, because, as we have shown, compliance was prevented by the orders of the Navy. The letter of April 19, 1943, giving Fast notice of an intention not to go further with the manufacture of its bearings, was not accepted as a cancellation, or as a basis for cancellation. Fast, through its attorney, replied to this letter and insisted that Precision carry out its obligation under the agreement. But at that time, and up to the bringing of this suit, Precision could not produce bearings because of the Navy. A question suggested by the sale of machinery and steel and from the letter of April 19, 1943, is whether they give a basis for a suit for anticipatory damages. It has been generally held in this country that before a plaintiff can rely on an anticipatory breach in order to recover prospective damages, he must accept the repudiation of the contract as such. *Friedman v. Katzner*, 139 Md. 195, 114 A. 884; *Williston on Contracts*, Revised Edition, Vol. 5, page 3722; *Hennessy v. Bacon*, 137 U. S. 78, 34 L. Ed. 605; *U. S. Potash Co.*

*v. McNutt,* 70 F. 2d 126 and cases cited. That the plaintiff failed to do in this case.

Apart from this, however, the orders and instructions of the Navy were the real cause of no production of Fast bearings, and this condition persisted to the time of bringing suit. What might be the rights of the plaintiff after the Naval operations ceased is not before us in this case, although it is strenuously insisted by Precision that the contract is not suspended, but is, in fact, terminated. On this question, we express no opinion.

The other questions in the case concerning the admission of evidence of damages and the proof of damages in general do not arise because of our view, hereinbefore expressed, that there was no breach of the contract. The judgment will therefore be affirmed.

*Judgment affirmed, with costs.*
*Cross-appeal dismissed.*