KAHN, ET AL. t/a E. Kahn Associates *v.* BROWN
t/a James Brown and The Famous Flames
Orchestra and Revue

[No. 53, September Term, 1969.]

*Decided December 2, 1969.*

The cause was argued before HAMMOND, C. J., and
BARNES, MCWILLIAMS, FINAN and SINGLEY, JJ.

*Gerald E. Topper* for appellants.

· *William Graham Boyce, Jr.,* for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Show business is the backdrop in this appeal. The appellee (Brown) is an idol [1] of the aficionados of "soul" music. Kahn [2] sought to assume the role of impresario but, as will be seen, he outsmarted himself and his efforts came to naught.

In 1964 Brown performed on two occasions in the Baltimore Civic Center. In June 1966 a promoter tried to "book" him into the Civic Center for another performance but the application was denied because of the "incidents of poor behavior attendant to the two previous shows" and because "there had been problems in other communities" during and after Brown's performances. In December 1966, Kahn sought to rent the Civic Center auditorium for a performance to be held on 25 March 1967. He was told that the Bullets (the Baltimore professional basketball team) would have first call on the facilities if they reached the play-off for the championship, but that it was unlikely they would get that far. To the dismay of their supporters it turned out that they had no need for the Center on 25 March. Kahn did not disclose to what use he proposed to put the auditorium. He was told, however, according to Harold Jennifer, the acting director, that there "were several acts" that would not be booked and that Brown was one of them. Kahn denied that any such statement was made to him.

Early in January Kahn went to New York to arrange for Brown's appearance in the Civic Center on 25 March. He said he "spoke with Mr. Allen [Brown's agent] concerning the James Brown show, and he [Allen] told * * * [Kahn] that there had been difficulties in trying

---

1. "Look" magazine suggests that James Brown may be "the most important black man in America." For more about this extraordinary young man *see* T. Barry, *The Importance of Being Mr. James Brown,* Look, Feb. 18, 1969, at 56.

2. Since Kahn acted for and on behalf of all of the appellants, we shall treat them as a single entity and refer to them as Kahn.

to book him [Brown] into Baltimore, that he had tried
* * * to book James Brown in, and had been unsuccess-
ful." Allen also told him "before the contract was signed,
* * * of their difficulties in trying to get [Brown] back
into the Civic Center, since that period in 1964." Never-
theless Kahn signed a contract, dated 10 January 1967,
agreeing to pay Brown $15,000, plus 55% of the net re-
ceipts over $40,000, for one performance at the Civic
Center on 25 March 1967. Kahn, as required by the con-
tract, made an immediate payment of $7,500 on account;
he agreed to pay the balance during the intermission on
25 March. A copy of the contract, executed by Brown,
was sent by Allen to Kahn on 13 January.

On 4 February 1967, the collapse of the Bullets hav-
ing become mathematically certain, Jennifer sent a tele-
gram to Kahn, whose address at the time was the "Pink
Pussycat," stating that the auditorium was "ready to
rent * * * for [an] appropriate show" and asking for
confirmation or release within 48 hours. When Jennifer
discovered that Kahn had James Brown under contract
to perform in the Civic Center on 25 March, he wrote
the following letter to Kahn's attorney:

"February 6, 1967

"Mr. Paul A. Dorf
Equitable Building
Baltimore, Maryland 21202
Dear Mr. Dorf:

"This letter will confirm my statements to you
by way of telephone today relative to the book-
ing of March 25, 1967, by Edward J. Kahn As-
sociates. Because of incidents, which are a
matter of record, occurring previously during
appearances of the James Brown Show at the
Baltimore Civic Center and because of the Bal-
timore Civic Center Commission's policy of not
booking acts where problems or situations not
in the best interests of the public have occurred,
the Baltimore Civic Center Commission has de-

cided that it would be inappropriate to book the James Brown Show at this time.

"We hope you will appreciate that the booking of Rock and Roll Shows here has brought about a very sensitive situation and the Commission is determined to be as careful as possible. These facts have been explained to Mr. Edward J. Kahn on several occasions when we have made known very clearly the Commission's wishes in regard to Rock and Roll bookings. It was on all of these occasions made very clear that we did not have the authority to book the James Brown Show.

"We have set a deadline of Wednesday at 5 p.m. for Mr. Kahn to confirm the booking of an acceptable presentation or to release his hold on Saturday, March 25, 1967.

> Sincerely yours,
> Harold J. Jennifer, Jr.
> Executive Director
> Civic Center Commission"

On 8 February Kahn filed a petition in the Baltimore City Court seeking a writ of mandamus to compel the Civic Center Commission to rent the auditorium to him on 25 March. He alleged, among other things, that he had been required to make a "cash deposit, *non-refundable*," of $7,500 to Brown. (Emphasis added.) The petition was denied on 15 February.

Kahn went back to New York and discussed the situation with Brown's agent. He was told that Brown would play for him in any auditorium that would hold at least 8,000 people. He tried to obtain the Lyric Theatre, the Coliseum, the Laurel Race Track and the Municipal Stadium; he was rebuffed by all for substantially the same reasons. Early in March he rented an open field in Baltimore County intending to stage the show in a huge tent. The zoning commissioner approved his application subject to approval by the Fire and Police De-

partments. The Police Department declined to give its approval. And so 25 March came and went without a performance by Brown and his Famous Flames either in Maryland or elsewhere.

Soon after 25 March, Kahn went again to New York to see about getting back his $7,500. The reaction to this was very cool indeed but Brown's manager told him Brown would "play for * * * [him] anywhere in the State, whenever * * * [he] could get up a show, to do * * * [him] a favor" but first he had "to make sure that the land, or wherever it was going to be held, was secured." Kahn, upon his return, approached the owners of Carr's Beach, near Annapolis, but it was found to be "too small." Kahn said, after Carr's Beach proved to be unsatisfactory, he "just went on believing that when the time would come I could apply the $7,500 to another contract." He suffered an abrupt change of mind, however, when, a few weeks later, he discovered that Brown was scheduled to perform on 4 June at the Green Acres Country Club in Charles County, near Indian Head. His nonresident attachment proceeding, the subject of this appeal, was filed in the Circuit Court for Charles County on 2 June. Kahn's attorney instructed the sheriff to "seize, attach and bring in custodia legis" $7,500 of the "ticket money." Brown filed a plea to the short note in the attachment case and a counterclaim seeking the recovery of the balance of the $15,000 ($7,500) which he alleged was due under the contract.

The case came on for trial before R. B. Mathias, J., sitting without a jury, on 26 September 1968. Although Brown had indicated an intention to be present at the trial, he failed to appear. Counsel dismissed the counterclaim; no evidence was produced on behalf of Brown. Judge Mathias was of the opinion that *State v. Dashiell*, 195 Md. 677 (1950), is controlling. We agree. In that case Judge Delaplaine, for the Court, said:

"* * * The Attorney General contended that, even though it was intended by the parties that

the State would apply for and obtain the Federal permit, the State was excused from that duty by impossibility of performance. It is a general rule of the common law that when the impossibility of performance arises after the formation of the contract, the failure of the promisor to perform is not excused. This rule was founded on the theory that if the promisor makes his promise unconditionally, he takes the risk of being held liable even though performance should become impossible by circumstances beyond his control. The unjust consequences of this general rule gave rise to certain exceptions. One of these is that a contractual duty is discharged where performance is subsequently prevented or prohibited by a judicial, executive, or administrative order, in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty. *Wischhusen v. American Medicinal Spirits Co.*, 163 Md. 565, 572, 163 A. 685; *Fast Bearing Co. v. Precision Development Co.*, 185 Md. 288, 44 A. 2d 735; 2 Restatement, Contracts, sec. 458. *But an order which interferes with the performance of the contract is not an excuse if the circumstances surrounding the formation of the contract are such as to indicate that the possibility of such interference was recognized and the risk of it was assumed by the promisor." Id.* at 689. (Emphasis added.)

Kahn, in his brief, goes on for some 18 pages about modification, impossibility of performance, forfeiture, novation and unjust enrichment but it all seems to us to be what a Mexican, with a slight shrug of his shoulders, would call *muchas palabras*. No reasonable person can doubt that Kahn had thrown caution to the winds when he signed the contract and paid over his $7,500. Even if

658

we accept his contradiction of Jennifer's statement that Brown was persona non grata at the Civic Center, it will be recalled that he himself testified that Brown's agent made an even more definite statement to the same effect before the signing of the contract. Indeed, at that time, Kahn did not have a firm commitment from the Civic Center, a fact which Brown, in his counterclaim, characterized as a "misrepresentation." One need not be especially astute to comprehend that Kahn, to borrow an expression from the game of poker, was trying to fill an inside straight and, to be sure, it very likely would have paid handsome dividends had he brought it off. Nor can he complain that Brown used him badly. Brown, holding strictly to the language of the contract, could have said he would perform *only* at the Civic Center and *only* on 25 March 1967. That would have been an end of the matter. Instead, "to do * * * [Kahn] a favor" and to help him "recoup * * * [his] losses" Brown offered to play for him "anywhere in the State." Even after 25 March Brown said he would play for him and give him credit for the $7,500. It would be interesting, but idle, of course, to speculate on what might have happened if Kahn had not been in such a hurry to attach Brown's gate receipts on 4 June. After all Brown did come back to the Civic Center and put on his show in September 1968, a circumstance which suggests a conclusion by the Civic Center Commission that the "situation" in Baltimore was not then as "sensitive" as it had been in March 1967.

Judge Mathias said he could not "understand how Kahn with this information available to him didn't protect his interest * * * and [he went on to say] the fantastic part of it is that * * * James Brown is still ready and willing to continue." Judge Mathias said also that he could not "understand why he [Kahn] didn't get him [Brown] in September [1968]." We think the reason is obvious and that enough has been said.

*Judgment affirmed.*
*Costs to be paid by appellants.*