**LEVINE** ET UX. *v.* **RENDLER** ET AL.

[No. 260, September Term, 1973.]

*Decided June 3, 1974.*

2

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*John A. Wolf,* with whom were *J. Nicholas Shriver, Jr.,* and *Thomas F. Mudd* on the brief, for appellants.

*T. Myron Loyd* for appellees.

SMITH, J., delivered the opinion of the Court.

Chagrined at the failure of a developer to construct roads in a subdivision in which they had purchased lots, appellees, Norbert J. Rendler *et al.,* sought legal redress. They sued appellants, Isaac Don Levine and Ruth N. Levine, his wife (the Levines), in the Circuit Court for Charles County. We shall here affirm a judgment of $39,500 entered in favor of those plaintiffs (the landowners) whose causes of action survived the Levines' motions for directed verdict.[1]

The subdivision, known as "Pinewood," is located in Charles County. It was shown that the Levines sold lots between October 19, 1965, and February 18, 1971, to various plaintiffs at prices ranging from $3,752.50 to $6,500.00. The landowners alleged in their declaration that representations were made by the Levines "or their agent, servant or employee, as the Sellers of said lot[s]" to the effect "that the road thru Pinewood Subdivision would be paved at the [Levines'] expense, in strict compliance with [Charles] County specifications so that upon completion of the paving, Charles County would agree to take over and maintain said road"; that the full purchase price for each of said lots had been paid; that the road has never been paved; and "[t]hat Charles County was prepared to make its final inspection prior to and subsequent to the paving of said road and that there were no conditions under the control of the County Commissioners other than that the said road meet the County's specifications, which had to be met prior to the paving of said road."

---

1. Owners of eleven lots were original plaintiffs; owners of five lots survived the motion.

Richard Eric Cramer, a Charles County real estate agent called as a witness on behalf of the property owners, testified that the Levines listed the Pinewood subdivision with his firm in 1965. He further said:

"I asked about the road, what were we going to tell these people about when we were going to open up the road in there, because that is the first question they asked. And then this paper was drawn up, you know, there were only a few of them made up actually, you know, most of the times he [sic] just told the people, if they questioned it, I would just hand them one of those letters, and that is about the size of it, letter discussed that he would be willing to blacktop the road according to the county specifications and that would keep the road up in such a shape that they could be used until it could be taken over by the county."

To corroborate the testimony of Cramer, a letter was produced which he identified as a copy of what he handed to prospective purchasers. He said that after he ran out of copies of the letter he represented to purchasers that which was said in the letter. The letter read:

October 1, 1965

TO ALL PURCHASERS OF LOTS IN
PINEWOOD SUBDIVISION:

The roads in this subdivision have been built in strict compliance with County specifications, except that the double Bituminous Surface Treatment has not yet been applied. We are prepared to apply it at this time, but are informed that it is the normal policy of the Board of Commissioners to wait until a reasonable number of families reside in the subdivision before taking over the roads.

This letter is therefore issued to assure that whenever the County is ready to make its final inspection for the purpose of taking the roads over, we stand prepared to give them the required double

BST, at our expense, just prior to the said final inspection.

When you construct your driveway entrance, you will have to use a corrugated metal pipe not less than 20 feet in length, and not less than 15 inches in diameter, in order to comply with the County road specifications.

Very truly yours,

For the Pinewood Subdivision

s/ Isaac Don Levine
s/ Ruth N. Levine

All parties agree that the regulations of Charles County relative to construction of roads in subdivisions in effect in 1965 said:

"The application of 2 inches of Bituminous Concrete is recommended and encouraged as a surface for these roadways, but in no event will less than a double Bituminous Surface treatment of less than 24' in width be accepted."

They likewise agree that effective January, 1969, that county adopted a much more comprehensive road ordinance. Under it, the "double Bituminous Surface treatment" was no longer permitted, but the application of two inches of bituminous concrete was required. The difference between the two specifications was succinctly explained by Tom W. Hall, the former engineer for Charles County, who, in the interim, had become resident maintenance engineer in that county for the State Highway Administration:

"The basic difference between the old regulations specifications and the new specifications were the fact that under the new specifications the road must be blacktopped, which is layman's word for bituminous concrete. Under the old specifications, it was a bituminous treatment, which is a double application of tar and chips, stone chips or slag chips and that's the difference."

He explained that a prime coat of oil is sprayed on the gravel surface in the double bituminous surface treatment. A heavier coat of asphalt is sprayed on the highway surface after the first coat has penetrated for at least 24 hours. This is followed by a layer of "blue chip." Then, after waiting several hours or, preferably, overnight, the same process would be repeated with a layer of heavier asphalt and another layer of "blue chip." He further explained:

> "Blacktop or bituminous concrete is made in a plant, in a mix plant similar to the way that concrete is made in a plant. It is a percentage of liquid asphalt which is a heavier grade than you use in surface treatment, is mixed in a plant with a certain amount of dust, a certain amount of one-sized stone and a certain amount of another sized stone and it's similar to the way you make cement concrete. This is bituminous concrete and your concrete that you make buildings out of or build roads out of, is Portland cement.

> \* \* \*

> "Blacktop or bituminous concrete is applied with a paver. You back a truck up to a paver, dump the material into the paver and the paver spreads it and then it is rolled. Surface treatment is applied by a distributor spraying the oil and then either another machine spreading chip on top of it or spread the chips directly off the dump truck. There's several ways that that can be done."

The present county engineer for Charles County, called as a witness by the Levines, testified that Hall's description of the differences in processes was a fair statement. He agreed that it "[w]ould ... be fair to say then under the old regulations they encouraged asphalt but you could get by with double surfaced treatment."

Hall, the former engineer, testified that the cost of preparation of the road is identical for both methods of surface treatment, but that the cost of bituminous concrete

is about double the cost of bituminous surface treatment. He explained that the bituminous surface treatment will last approximately three to five years, but the bituminous concrete will last 15 to 20 years.

Robert H. Portzen, an expert called on behalf of the landowners, testified that the cost of completion of the roads in the subdivision with a double bituminous surface treatment would be $29,171.00, while the cost of completing those roads with bituminous concrete would be $30,875.00.

Nicholas J. Scarpa, the present county engineer for Charles County, gave an estimate that the cost of construction of roads in this subdivision with bituminous concrete would be $46,680.00. From this, with the statement of Hall that the cost of bituminous concrete is about double the cost of bituminous surface treatment, the Levines reason that "[t]he cost of said double Bituminous Surface Treatment would have been (in 1973) approximately $20,000.00, the maximum amount which under Plaintiffs' theory of law — the enforcement of Defendants' agreement — Plaintiffs could have hoped to recover." To reach this conclusion there are certain assumptions that must be made. One would be that $23,340.00 (one-half of $46,680.00) would be approximately $20,000.00, and it would be further necessary to assume the correctness of both estimates. Otherwise, one must assume that Scarpa, called as a witness by the Levines, erred in his estimate of $46,680.00 for construction with bituminous concrete or that Hall, a witness for the property owners, erred in his estimate that the cost of such construction with bituminous concrete would be about double the cost of construction with the bituminous surface treatment.

The case was tried in the circuit court and argued to us upon the assumption of all parties that the representations by the Levines or their agents to the landowners survived execution and delivery of the deed to each of the various parties plaintiff.

Two contentions are advanced to us. The first is that the trial judge erred in refusing to grant the motion of the Levines for a directed verdict on the grounds of legal

impossibility of performance. The second contention concerns instructions to the jury and is in two parts. It is claimed (a) that the jury should have been instructed on the theory of legal impossibility of performance of the agreement because of the change in road specifications, and (b) that the jury should have been instructed, as requested by the Levines, "[o]n the provision in [the Levines'] agreement that a reasonable number of families had to reside in the subdivision before [the Levines] were required to hard-surface the roads, so as to permit the jury to consider whether in fact a reasonable number of families resided in the subdivision, a condition precedent to the requirement to hard-surface the roads."

I

The Levines put two strings in their bow on the issue of impossibility of performance: (a) that change in the law made performance legally impossible, and (b) that the change in the law, with increased costs, has made performance of the obligation virtually different from what was reasonably contemplated by the parties to the contract when they entered into the contract.

The Levines misconstrue the doctrine of impossibility of performance. It was discussed for this Court by Judge Delaplaine in *State v. Dashiell,* 195 Md. 677, 75 A. 2d 348 (1950):

> "It is a general rule of the common law that when the impossibility of performance arises after the formation of the contract, the failure of the promisor to perform is not excused. This rule was founded on the theory that if the promisor makes his promise unconditionally, he takes the risk of being held liable even though performance should become impossible by circumstances beyond his control. The unjust consequences of this general rule gave rise to certain exceptions. One of these is that a contractual duty is discharged where performance is subsequently prevented or

prohibited by a judicial, executive, or administrative order, in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty. *Wischhusen v. American Medicinal Spirits Co.*, 163 Md. 565, 572, 163 A. 685; *Fast Bearing Co. v. Precision Development Co.*, 185 Md. 288, 44 A. 2d 735; 2 Restatement, Contracts, sec. 458. But an order which interferes with the performance of the contract is not an excuse if the circumstances surrounding the formation of the contract are such as to indicate that the possibility of such interference was recognized and the risk of it was assumed by the promisor." *Id.* at 689.

More recent discussion consistent with the above is to be found in *Baldi Constr. Eng'r v. Wheel Awhile*, 263 Md. 670, 673, 284 A. 2d 248 (1971); *Kahn v. Brown*, 255 Md. 652, 656-57, 259 A. 2d 61 (1969); and *Acme Markets v. Dawson Enterprises*, 253 Md. 76, 89-90, 251 A. 2d 839 (1969).

It is the position of the Levines that their "express agreement [was] to hard-surface the roads in Pinewood Subdivision with the Blue Chip method, in conformity with the 1965 road specifications," and that this "was rendered impossible by the 1969 change in road specifications, and as a matter of law, [the Levines] should not be held to that agreement." They rely upon *Wischhusen v. Spirits Co.*, 163 Md. 565, 163 A. 685 (1933), and *Acme Moving & Storage v. Bower*, 269 Md. 478, 306 A. 2d 545 (1973).

*Wischhusen* involved a contract by a distiller with an expert in the manufacture of whiskey. He was employed to have the exclusive management and control of all operations at a particular distillery. The employer was dependent upon a permit from the United States Government. The application had been filed but the permit had not been issued at the time the contract of employment was made. The employer was notified that the application to distill "could not be approved unless the position held by the plaintiff was 'filled by one who is entitled to the full confidence of the Government.' " Upon receipt of that notice,

the employer informed Wischhusen of the situation, discharged him, "and declared the contract between them terminated because of the impossibility of further performance by the plaintiff." As Judge Parke put it for the Court:

"The effect of the government's official notice was that the defendant could not obtain a permit lawfully to manufacture whisky so long as the plaintiff was in its service at the plant, but the contract to pay the plaintiff the weekly wage throughout a year was in consideration of the daily performance by the plaintiff of his service as distiller in charge. The service, which took time, must first be performed before the weekly payment of money, which could practically be instantaneous, need be made. If the plaintiff should not continue to perform this service, week by week, during the remaining period of his contract, there would be a total failure of consideration for that period. Since a permit to manufacture whisky would not be issued, the defendant could not lawfully operate its plant, and there would be no service within the terms of the contract for the plaintiff to render, because it will not be gratuitously assumed that the contracting parties contemplated the illicit manufacture of whisky. The stipulations of the contract must therefore be construed to have implicit reference to a continuing lawful manufacture that would require a grant by the federal government of a permit to manufacture whisky. The refusal of the necessary permit was therefore a subsequent, unanticipated, circumstance, in connection with which the contract must be construed and the relative rights of the parties ascertained." *Id.* at 570.

It was held that this amounted to impossibility of performance.

In *Acme Moving*, a tenant sought specific performance of

a lease said not to have been "a model of clarity or consistency" and to have been prepared by a real estate broker who was not a member of the bar. Rent was to begin "upon use and occupancy permit & government approval." Zoning regulations required that the warehouse be *wholly enclosed* while the planning board set up a landscaping plan which required removal of a chain link fence (required to be erected to wholly enclose the warehouse) and removal of a sidewalk next to that fence which functioned as a retaining walk next to the buildings. Judge Barnes said for the Court:

> "The landlord was thus placed in the dilemma that if he complied with the landscaping plan approved by the Planning Board, he would not have a wholly enclosed warehouse as required by the zoning law and the special exception. In addition, the landlord testified that if the chain link fence were removed, it would expose the subject property to trespassers and vandals. There has already been some loss from vandals even with the chain link fence. Then, too, Mr. Bower stated, the sidewalk was required by the building permit department to keep trucks from backing over and damaging the chain link fence. As a result of this impasse between the two inconsistent requirements, the landlord has not, and apparently will not, receive a use and occupancy permit for warehouse purposes." *Id.* at 482-83.

We held that this did indeed constitute impossibility of performance, stating:

> "It is clear from the lease, itself, as well as from the applicable law, that a use and occupancy permit to use and occupy the property for warehouse purposes is essential. There is no evidence that Mr. Bower was in any way at fault in not obtaining the use and occupancy permit and, indeed, the record shows cooperation by him in fulfilling the governmental requirements. He has been impaled upon the horns of an administrative dilemma

through no fault of his own. There is no suggestion in the record that the refusal to issue the use and occupancy permit was foreseeable and that the landlord Bower assumed the risk. Under these circumstances, the defense of impossibility of performance is properly available to him." *Id.* at 484-85.

The Levines also rely upon Restatement, *Contracts* § 458 (1932), for the proposition that they say was established in *Wischhusen* and on which they rely, "that impossibility because of change of law preventing performance is a valid defense, if such impossibility is without fault of the promisor, is not foreseeable at the time of the execution of the contract and the risk is not assumed by the promisor." Insight into what is really meant by this doctrine is provided by one of the illustrations in the Restatement:

> "4. A, a carrier, contracts with B to give B an annual pass as long as B continues in business, in consideration of a conveyance of land made by B to A, such a contract not then being prohibited by law. A pass is given annually for some years by A. Subsequently a statute forbids the granting of passes by carriers, and A thereafter refuses to issue a pass. A's duty is discharged." *Id.* at 855.

In this case we have no prohibition against construction of a road by the Levines analogous to the prohibition in the example from the Restatement or the factual situation existing in *Wischhusen,* nor do we have an utter impossibility of compliance brought about by conflicting governmental authority as in *Acme Moving.* We have a change in the county specifications. The possibility of that change should have been perceived by the Levines back in 1965 because the county regulations at that time showed a strong preference for bituminous concrete, although there was an indication that the bituminous surface treatment would suffice. Obviously, the cost of upkeep of the roads, once they were accepted by the county, would be much higher if the bituminous surface treatment were used. Therefore, there

was every reason to expect that the county might move to a requirement that would cost it less money over the years to maintain the roads in the condition in which they were received.

The contention of the Levines, that the change in the law, with a higher cost of performance, makes the obligation substantially different from that originally contemplated by them, likewise must fall. They agreed to put in a road to county specifications. As it was put in *407 East 61st Garage, Inc. v. Savoy Fifth Avenue Corp.*, 23 N.Y.2d 275, 244 N.E.2d 37 (1968):

> "[T]he applicable rules do not permit a party to abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantagous to perform it; were the rules otherwise, they would place in jeopardy all commercial contracts." *Id.* at 282.

There is yet another reason why a directed verdict should not be entered for the Levines. At least one of the lots was sold . after the new regulations went into effect. The purchaser testified that he was advised that "the road was going to be paved and [Cramer] stated that it was going to be brought up to county specifications at some point in time." Cramer indicated that this would be done by Mr. Levine. Since the "county specifications" in force at the time of that purchase called for paving with bituminous concrete, the inference could well have been drawn that this was the type of road to be installed. In passing upon a motion for directed verdict we must bear in mind that the non-moving party is entitled to have us assume the truth of testimony offered on that party's behalf and resolve any conflicts in the testimony in favor of that party, giving that party the benefit of all reasonable inferences to be drawn from that testimony. *Rubinstein v. Jefferson Nat'l Life*, 268 Md. 388, 395, 302 A. 2d 49 (1973); *Wood v. Abell*, 268 Md. 214, 230-31, 300 A. 2d 665 (1973); and *Summit Loans, Inc. v. Pecola*, 265 Md. 43, 46, 288 A. 2d 114 (1972).

## II

A litigant is entitled to have his theory of the case presented to the jury, but only if that theory of the case is a correct exposition of the law and there is testimony in the case which supports it. *Fowler v. Benton,* 245 Md. 540, 548-49, 226 A. 2d 556 (1967), and *Schaefer v. Publix Parking,* 226 Md. 150, 152-53, 172 A. 2d 508 (1961). As Judge Prescott put it for the Court in *Schaefer,* "The trial courts, in presenting their instructions to the juries, are not required to give the juries merely abstract statements of the law that have no relation to the facts of the case being tried."

### a.

There was no evidence warranting an instruction on the issue of impossibility of performance. Therefore, there was no error in not giving the instructions.

### b.

Rule 554 d provides relative to jury instructions:

> "If a party has an objection to any portion of any instruction given, or to any omission therefrom, or to the failure to give any instruction, he shall before the jury retires to consider its verdict make such objection stating distinctly the portion, or omission, or failure to instruct to which he objects and the ground of his objection. . . ."

If he fails to do so, then pursuant to Rule 554 e the point is not before us for review. *S & S Bldg. Corp. v. Fidelity Storage,* 270 Md. 184, 189, 310 A. 2d 778 (1973). In this instance the record relative to the exception and the response of the court is as follows:

> "Mr. Mudd [counsel for the Levines]: * * *
>
> "And I further except to the failure of the Court to grant an instruction dealing with the requirement of cooperation on the part of the plaintiffs, requiring them pursuant to the terms of

the October 1, 1965 letter to cooperate with the endeavor of the defendants to provide and effect a reasonable number of residents reside [sic] on the property prior to Mr. Levine's assumption of responsibility to pave the streets with blue chips. We feel the evidence shows there is a lack of evidence in that there were a reasonable number of persons residing within the subdivision as of the date immediately preceding the new subdivision regulations, new road regulations, that is January 1, 1969, so as to require Mr. Levine to act before the implementation of the new regulations.

"This lack of cooperation was again an excuse or relieved him from any responsibility of his failure to build the road.

"THE COURT: I don't recall anything in the testimony as to cooperation or lack of cooperation."

The earlier Charles County road regulations had provided that the procedure for obtaining county acceptance of roads was to submit a petition to the county commissioners requesting that the roads be accepted in the maintenance system "[a]fter roads are built, and a reasonable number of families are living thereon . . . ." It will be recalled that the letter of October 1, 1965, from the Levines to which reference has earlier been made, stated that they were "informed that it is the *normal* policy of the Board of Commissioners to wait until a reasonable number of families reside in the subdivision before taking over the roads." (Emphasis added.) No such provision appears in the regulations of 1969.

Since we view the enactment of the new regulations as not having relieved the Levines from their responsibility under the contract, it follows that there was no error in rejecting the request for instructions if it were to be interpreted as being one suggesting that there was a requirement that a reasonable number of persons reside within the subdivision "as of the date immediately preceding the new subdivision regulations . . ., that is January 1, 1969." If the request for instructions were interpreted as one relative to cooperation

on the part of the landowners "with the endeavor of the defendants to provide and effect a reasonable number of residents [to] reside on the property prior to Mr. Levine's assumption of responsibility to pave the streets with blue chips," then for the reasons given by the trial judge there was no error.

*Judgment affirmed; appellants to pay the costs.*