891 A.2d 1148

RAD CONCEPTS, INC.

v.

WILKS PRECISION INSTRUMENT CO., INC. a/k/a
Wilkes Precision Instrument Co., Inc.

No. 478, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Feb. 2, 2006.

William D. Hall, Potomac, for Appellant.

Josef E. Rosenblatt, Baltimore, for Appellee.

Panel: DAVIS, THEODORE G. BLOOM (retired, specially assigned) and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

DAVIS, Judge.

Rad Concepts, Inc. (hereinafter RAD), appeals from the judgment rendered by the Circuit Court for Montgomery County (Woodward, J., presiding), at a bench trial, in favor of appellee, Wilks Precision Instrument Company, Inc. (hereinafter WPIC), in the amount of $119,142.10 for RAD's breach of contract and the dismissal of the claims and counterclaims of appellant. On this appeal, RAD presents the following questions for our review, which we set forth verbatim:

Question No. 1. Did WPIC breach Contract #1 at least as early as October 2000, again on January 25, 2001, and again on February 1, 2001, by demanding that RAD pay immediately over $100,000 before any product (not even one unit) would be supplied, notwithstanding the fact that under the "creative financing" Contract #1 RAD needed only a few dollars, if any at all, to obtain one, or a few, of the 5,000 units.

Question No. 2. Did WPIC breach Contract #1 in August 2000 when it did not send RAD a sample of the product and obtain RAD's approval, after tooling was complete and before production began of the 5,000 units?

Question No. 3. Did the court err in holding that RAD repudiated Contract #1 in a telephone call on February 5, 2001?

Question No. 4. Was the court's findings that RAD repudiated Contract #1 in a telephone call based on sufficient evidence to make out a *prima facie* case?

Question No. 5. Did the trial court err in relying on a statute Comm [sic] Law 2–609 and 2–610; in view of:

A. Bernstein's letter of January 25, 2001 was not a proper written "demand" under Sec. 2–609 since it required RAD to show facts not called for in Contract #1.

Question No. 6. On February 13, 2001, WPIC wrote its lawyer Bernstein, saying "The reason we have felt it necessary to take this action is due to the belligerent and accusatory attitude taken by Mr. Strawder on some occa-

sions." Legal issue: Can Sec. 2–609, and the various contract issues in this case be upheld in view of such facts? Question No. 7. Where Contract #1 provides for RAD's right of approval of the final product, did the Court err in deciding that the final product met the contract requirement? Moreover, since WPIC admitted that the final product had marks on them and that there was a "cosmetic problem" did RAD have the final say as to whether the 5,000 units met the terms of the contract?

## FACTUAL BACKGROUND

This appeal arises from claims of breach of contract between former business associates involved in the manufacturing and selling of radiology equipment. According to Thomas B. Wilks, President of WPIC, he met with Glenn Strawder of RAD in February of 1998 "to give [him] some budgetary quotes so he knew what he was looking at for costing on tooling and piece parts costs" for the manufacture of a patented x-ray cassette holder. Appellant sought this information to determine how much capital would be required to launch this new venture. WPIC was impressed with the cassette holder and, accordingly, informed appellant that no "up front" money would be required with creative financing. With this specialized financing, RAD was able to have the tooling for two steel molds for its project amortized into the unit price. RAD explained that, although it had approximately $30,000 to pay to WPIC at the initiation of the contract, WPIC instructed appellant to use that money for advertising instead.

The parties did not draft a formal agreement until two years later. WPIC submitted a proposed contract to appellant to which the latter responded by proposing an amendment that provided for RAD to improve the sample and the finished product. WPIC agreed to the amendment and the final contract read as follows:

*Contract #1*

Under this heading the original Contract #1, plus its amendments, and testimony relating thereto are set forth. The original Contract #1 of February 22, 2000 reads as follows:

**138**

Date: 02/22/00
To: Rad Concepts
Fax #: 301-483-9433
From: Tom
Total # of Pages: 2
Dear Glen [sic],

This company is pleased to submit the following quotation for your review:

one (1) Single Cavity Production Mold to Produce Tray and one (1) Single Cavity Production Mold to Produce I-Beam (Including engineering drawings) ........................... $62,948.00

Parts Molded in the Above Molds from Black ABS (including 2 ea. Holes drilled and tapped in the tray, and 2 ea. Thumb Screws per Set) ............................... $10.63/Set
Note: One Set = One Tray and One I-Beam

Tooling amortization on 5,000 Sets ................... $12.59

Total Parts Costs for Initial Order of 5,000 Sets ....$23.22 each

Special Packaging will be quoted upon request.

Delivery: Samples in Twelve (12) to Fourteen (14) weeks, after receipt of Order and Approval of Drawing(s) by Rad Concepts, Inc/Glenn Strawder.
F.O.B.: Our Plant

Terms: Tooling cost(s) to be amortized over initial order of 5,000 sets (as discussed above) purchased within one (1) calendar year of tooling completion and approval of Samples/Finish Sets. Net 30 Days for production, upon approval of Credit. Shipping will be UPS (ppd & add). Ownership of Tooling will transfer upon timely payment of parts invoices totaling at least 5,000 sets.

Please note: Future orders will carry a Mold Set-up Charge of $350.00 per Mold per run. Minimum quantities may be required due to vendor requirements on the Thumbscrews.

Lastly, we request that Rad Concepts, Inc/Glenn Strawder purchase all injection molded products covered under U.S. Patent #6,017,149 from WPIC for a period of at least five (5) years from approval of Sample/Finish Set.

We hope this quotation meets with your approval and you favor us with your order.

Very truly yours,

(Signed)

We incorporate the factual background and ruling as set forth in the circuit court's Memorandum Opinion, excluding footnotes and citations to the record: [1]

Pursuant to the contract, WPIC produced steel molds for the tray and I–Beam bar in accordance with the drawings approved by Mr. Strawder. Although the drawings specified 7/16″ brass screws, the sample screw provided to WPIC by Mr. Strawder was "off size" and smaller than a standard 7/16″ screw. Mr. Wilks suggested, and Mr. Strawder agreed, to use a smaller 3/8″ screw because it was less expensive. However, Mr. Strawder wanted to see how the smaller screw worked before committing RAD to the purchase of 10,000 screws for the 5,000 cassette holders. Accordingly, by letter dated May 5, 2000, Mr. Wilks offered to provide 500 smaller "thumb screws" for RAD at a cost of $2.75 each. On May 16, 2000, Ms. Mott [Vice President of RAD] noted her agreement on Mr. Wilks' May 5 letter.

On June 19, 2000, WPIC completed production of the first 47 cassette holders or units and notified RAD that the units were ready for delivery. On the same day, Mr. Strawder and Ms. Mott went to the WPIC plant, picked up the units and paid the full amount due, as set forth in Invoice No. 14327, for the 47 holders and the remaining 406 screws (94 screws were used in the 47 units).

However, a letter dated June 19, 2000, was delivered to WPIC reducing RAD's initial order of 5,000 units to 703 units and 1,000 screws. According to Mr. Strawder, WPIC responded with the following: if RAD raised the order back to 5,000 units, (1) RAD would not have to pick up the entire 5,000 units at one time; (2) RAD would be invoiced only for the amount it picked up; and (3) RAD would not have to pay for the "first couple of batches of" cassette holders until

---

1. Because we shall, in our discussion, adopt the rationale undergirding the circuit court's well-crafted opinion, we set forth verbatim the text of the Memorandum Opinion.

RAD sold and collected money from its customers. On July 17, 2000, Ms. Mott cancelled the order for 703 units and reinstated the initial order for 5,000 units by sending WPIC the following letter: "Please void our order dated June 19, 2000. We now request an order of 5,000 holders and 10,000 screws."

The first 47 units were rejected by RAD because of scratch marks on the surface of the trays. Mr. Wilks then suggested texturing the surfaces of the trays to reduce the scratch marks and offered to replace, without charge, the 47 holders with textured trays. On July 28, 2000, after RAD agreed to pay $2,300.00 for texturing the 5,000 units and $400.00 for freight, WPIC faxed a letter confirming such charges and the continued use of the smaller screws WPIC had employed in the first 47 holders. Ms. Mott replied to WPIC with a hand-written note agreeing to amortizing the new charges but objecting to the smaller screws and requesting the larger screws specified in the drawings. Ms. Kelvie [Office Manager for WPIC] then calculated the new amortization charge by crediting the amortization amount paid by RAD on the 47 units (Invoice No. 14327) and adding the texturing and freight costs. The result was an increase in the amortization charge for the 5,000 holders from $12.59 to $13.00 per unit. Mr. Wilks also agreed to use the larger screws in the 5,000 holders. On August 1, 2000, WPIC sent the 800–pound steel mold to an outside vendor for engraving texture on the surfaces of the tray mold.

In order to use up the previously ordered 500 smaller screws, Mr. Strawder verbally placed an order with WPIC for 195 units in early August. On August 23, 2000, after receiving the textured mold, WPIC began running the order of 195 units and the replacement of the 47 original holders. On August 25, 2000, RAD picked up the 242 units from the WPIC plant without inspection and without making any payment and immediately began to fill the orders received from its customers. On August 31, 2000, WPIC sent RAD Invoice No. 14415 for the 195 units, which invoice reflected the new amortization charge of $13.00 per unit. Mr. Straw-

der requested time to pay this invoice and Mr. Wilks agreed to payment by January 1, 2001, but if not paid by that date, WPIC would impose interest at the rate of 1.5% per month accruing from the original due date of September 30, 2000. On December 4, 2000, Ms. Mott submitted a payment of $1,000.00 toward Invoice No. 14415 with a hand-written note saying: "Tell Tom that this is a partial payment on Invoice No. 14415. Thank you for your patience. We hope to pay the rest as soon as possible." RAD made no further payments on Invoice No. 14415. By the end of December 2000, RAD had sold 39 units at $249.00 per unit, for a total revenue of $9,711.

Meanwhile, on August 23, 2000, WPIC began to manufacture the 5,000 holders. A sample holder from the final run of 5,000 units was sent on September 11, 2000 to RAD for its approval. On September 14, 2000, Ms. Mott telephoned Ms. Kelvie and acknowledged the receipt of the sample. According to Ms. Kelvie, Ms. Mott said, "It looked wonderful. Go with it." Ms. Kelvie also [stated] that she discussed with Ms. Mott a new amortization amount for the tooling costs based upon the balance of such costs after payment on the previous invoices, plus the texturing, spread over the 5,000 units ordered by RAD. Ms. Kelvie memorialized Ms. Mott's approval of the September 11 sample by writing "Parts approved 9/15 [sic]/00" on RAD's July 17 order for 5,000 holders. Ms. Kelvie also noted the new amortization cost by writing on the same document the following:

```
* New    65,000.00
  Amort  <2,535.00>  Inv. #14415
         62,465.00
```

Conversely, Ms. Mott [explained] that she did not recall ever making such statement but remembered having told Ms. Kelvie that Mr. Strawder would evaluate the sample and get back to WPIC. Mr. Strawder also [stated] that he never approved the September 11 sample.

After the Mott–Kelvie telephone conversation, WPIC completed the final order of 5,000 units on September 19, 2000. WPIC did not notify RAD of the completion of the 5,000 units, and RAD never picked up any of these units.

In a letter dated December 12, 2000, Mr. Strawder wrote to Mr. Wilks the following:

Hi Tom,

How is everything? Hope life is good! Do you need any help spending your money? (Smile)

Tell you why I'm writing. Please find enclosed one of the 200–plus holders of RAD Concepts, Inc. from our first shipment from you. Please look at the top surface of the bar. Can you tell us why there are all of those scratches? Lori [Mott] checked most of the boxes of holders we received from you and all of them are like this. Do you know what happened? Are these marks permanent? Or can it be corrected? Do you think these are major marks? How did it get past your peoples [sic]? Do you think that the others you have made up are damaged like this too?

Tom when we talked about the plate like portion of the holder being fabricated so that it would look better then [sic] originally shown us, the bar did not have these majors [sic] marks on the top surface. I do not want to get any of your employees in trouble but someone is always doing something that I do not believe is normal in your industry. We are receiving units that have mistakes to [sic] often.

You know Tom how important it is for us to make a good first impression. You know this is a brand new product and we need to make a good start. HELP US!!!!!

Sincerely,

Glenn

After several unsuccessful attempts to contact RAD in order to respond to the above letter, Mr. Wilks referred the matter to WPIC's attorney, Damon Bernstein. Mr. Bernstein wrote a letter to RAD dated January 25, 2001, notifying it of the completion of 5,000 units and requesting assurances of performance. In that letter, Mr. Bernstein wrote the following:

... Under the agreements between the parties, WPIC has produced the items requested and it stands ready to deliver the balance of the order. Apparently, after you recognized the extent of your delinquency in making payment, a letter was sent questioning the quality of the final product. To the extent that the units have a blemish, this can readily be corrected. However, WPIC has every reason to question RAD's ability and intentions with regard to payment. Therefore, you must provide actual payment or assurances acceptable to WPIC that the amounts due will be paid within a time certain which is acceptable to WPIC, before any further product or corrective action will be furnished ...

Before he could respond to Mr. Bernstein's letter, Mr. Strawder received a telephone call from Mr. Wilks on February 5, 2001. During the conversation, which became acrimonious, Mr. Wilks said, "If we cannot sort things out, maybe our lawyers can." In turn, Mr. Strawder said that he was never going to buy the "trashes" WPIC produced. On the same day, Mr. Strawder wrote a letter to Mr. Bernstein stating that he could not understand why Mr. Bernstein was claiming that RAD owed WPIC for the 5,000 units when Mr. Wilks mentioned a past due amount of only $1,500.00. Mr. Strawder then offered to make installment payments of at least $150.00 per month until the debt was satisfied.

On February 10, 2001, RAD received Invoice No. 1144 from WPIC for $118,150.00, which covered the manufacturing costs and tooling amortization for 5,000 units. Mr. Strawder wrote Mr. Bernstein a second letter dated February 20, 2001 complaining that half of the 242 units had I–Beam bars with scratch marks, which prevented the sale of these units to RAD's customers. He demanded that the scratched I–Beam bars be replaced with new ones. Mr. Strawder also demanded that WPIC give an explanation concerning the scratch marks on the I–Beam bars because he could not believe Mr. Wilks' claim that those marks were normal and part of the molding process. Regarding future payments to WPIC, Mr. Strawder stated that RAD needed

to spend all of its money on marketing, advertising, shipping, and billing the product to its customers. Nevertheless, RAD would continue to make installment payments of $150.00 per month as promised in Mr. Strawder's February 5 letter.

In the year 2000, RAD sold 14 cassette holders during the month of August, 16 in September, 6 in October, 2 in November, and 1 in December. Thereafter, RAD sold 37 more units until January 3, 2002. Out of a total of 76 holders sold, RAD received only 3 back from its customers.

WPIC filed its Complaint on December 4, 2001, requesting judgment against appellant for the outstanding balance due and owing of $121,757.85 and interest in the amount of $8,446.33. Appellant filed an Amended Counterclaim against appellee on January 3, 2002, in which it set forth a prayer for damages of over $16,000,000 for appellee's alleged breach of contract.

After settlement discussions failed, the parties stipulated to proceeding by way of a bifurcated trial to determine separately the issues of liability and damages. The circuit court granted the parties' request on January 8, 2003. The court conducted a two-day bench trial on the issue of liability on June 30, 2003 and July 1, 2003, after which the parties submitted proposed findings of fact and conclusions of law. The court heard closing arguments on November 13, 2003 and held the matter *sub curia.*

On January 12, 2005, the court issued its Memorandum Opinion, in which it announced that judgment would be entered in favor of WPIC on its claim and against RAD on its counterclaim:

### *MEMORANDUM OPINION*[2]

... WPIC seeks to recover the amounts due for plastic trays and accompanying I–Beam bars manufactured by it

---

**2.** All underlining, bold and italics are found in the original. We have excluded the footnotes and citations to the record found in the court's Memorandum Opinion.

under a contract with RAD. WPIC claims that RAD owes, after all credits and payments, $119,142.10. RAD denies liability to WPIC in any amount and counterclaims for alleged breaches of the contract by WPIC. RAD claims $16,050,128.00, plus interest and the costs of this action.

The trial was held without a jury and was limited to issues of liability. This court, having considered the testimony of all witnesses, the exhibits admitted into evidence, and the arguments of counsel, renders its findings of fact and conclusions of law.

## I. The Parties

WPIC is a Maryland corporation that has been in the business of injection molding since 1945. WPIC manufactures molded plastic products through an injection process according to designs and specifications requested by customers. Thomas Wilks, president and CEO of WPIC, and Sandra Kelvie, office manager, testified during trial. Michael Greco, vice president of WPIC, testified only by deposition, which was admitted into evidence. RAD, also a Maryland corporation, is a start up company organized to sell a U.S. patented x-ray cassette holder to hospitals and radiology offices. The holder consists of a plastic tray, I–Beam bar, and two brass screws to hold an x-ray cassette. The holder has the unique ability to hold an x-ray cassette in an upright position while accommodating various positions of the patient. Glenn Strawder, president of RAD, is the inventor and the sole owner of the U.S. Patent for the x-ray cassette holder, which patent was granted on January 25, 2000. Mr. Strawder and Lori Mott, vice president of RAD, testified during the trial.

\* \* \*

## III. Present Controversy

It is undisputed that WPIC and RAD executed an agreement dated February 22, 2000, for the manufacture of 5,000 x-ray cassette holders at a price of $23.22 per unit. Under the terms of the agreement, WPIC was required to produce a sample and a finished set of x-ray cassette holders for

RAD's approval. RAD also requested 195 additional units so that the 500 smaller screws could be used.

WPIC contends that the 195 and 5,000 units are good and completely merchantable products manufactured under a single contract and that WPIC is entitled to judgment for breach of contract because RAD (1) failed to notify WPIC of its rejection or revocation of acceptance as to the 195 units and (2) repudiated the contract as to the 5,000 units by failing to give adequate assurances of its performance. On the other hand, RAD contends that the 195 units were not a salable product and further avers that there were "two totally different separate contracts" (one for the 5,000 units and the other for 195 units) or that there was a "divisible contract" where a breach of one contract had no effect on the other. RAD claims that WPIC materially breached the contract for the 5,000 units by (1) failing to send RAD a sample of the tray and the I–Beam bar, by (2) not obtaining RAD's approval before production, by (3) failing to notify RAD of the completion of the 5,000 units, and by (4) ceasing all further performance of the contract.

### IV. Statement of Issues on the WPIC Complaint

The question WPIC brings before this Court is whether WPIC is entitled to recover from RAD the contract amounts for the x-ray cassette holders WPIC produced pursuant to the contract dated February 22, 2000. This question raises three issues for resolution by this court. The first issue is whether the contracts for 195 and 5,000 units constitute a single contract or two separate contracts. The second issue is whether RAD is liable for the balance due on Invoice No. 14415 for the 195 units. The third issue is whether WPIC is entitled to recover the contract price for the 5,000 units that were manufactured by WPIC but were never delivered to RAD.

### V. Contracts

*Issue One:* Whether WPIC and RAD entered into a single contract or two separate contracts—one for the 195 units and another for 5,000 units?

It is clear from the evidence that RAD's oral request for 195 units in August 2000 was a contract for 195 units in addition to the 5,000 units contemplated by the February 22, 2000 agreement. RAD urgently needed a quantity of cassette holders in order to fill the orders from its customers. Mr. Strawder testified that orders for the holders were beginning to come in by August 2000. However, the 5,000 units were not going to be ready because the larger screws that Mr. Strawder preferred would not arrive until September. Since the smaller screws were available, RAD wanted WPIC to quickly assemble 242 units (195 new ones plus 47 replacements) with the smaller screws so that RAD could immediately fill its orders. WPIC's conduct is also evidence of the creation of two separate contracts. WPIC manufactured, delivered and billed RAD for 242 cassette holders using the smaller screws and then produced and billed RAD for 5,000 holders using the larger screws.

On the basis of these facts, the court finds that the parties entered two separate contracts—one for 195 units and another for 5,000 units.

### VI.  Liability on the Contract for 195 Units

*Issue Two:* Whether RAD is liable for the balance due on Invoice No. 14415 for 195 units?

### (a)  Acceptance

The right of manufacturer [sic] of goods to recover the purchase price is to be determined under Maryland's Uniform Commercial Code, which provides that the seller may recover the price of goods accepted when buyer fails to pay the price as it becomes due. Md. Com. Law Code Ann. § 2–709(1)(a). The Code provides that acceptance of goods occurs when the buyer (i) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming, § 2–606(1)(a): (ii) fails to make an effective rejection after the buyer has had a reasonable opportunity to inspect, § 2–606(1)(b); or (ii)[sic] does any act inconsistent with the seller's ownership, § 2–606(1)(c).

This court finds that RAD accepted the 195 units by acting in a manner inconsistent with seller's ownership. On August 25, 2000, Mr. Strawder and Ms. Mott picked up 242 units, including 47 replacements, from the WPIC premises and on August 28, 2000, RAD began to ship this product to its customers. RAD sold 39 units from the time of receipt until it complained about the scratch marks on the I–Beam bars on December 12, 2000. Thereafter, RAD sold 37 more units.

In addition, this court finds that RAD failed to make an effective rejection after having a reasonable opportunity to inspect. When Mr. Strawder and Ms. Mott picked up the 242 units on August 25, they had ample opportunity to inspect the product, but failed to do so. At trial Mr. Strawder testified that he called Mr. Wilks in August or September and rejected the 195 units. However, he was unable to produce any evidence corroborating such telephone call. Mr. Strawder testified as follows:

Q. What record do you have of that communication?

A. What communication? Between?

Q. How you communicated to Mr. Wilks?

A. You'll have to take my word for it.

Q. Do you have any telephone records memorializing that?

A. Most of my calls, because Lori used the business phone most of the time. When Tom would call me he would call me either on the business phone or he'd call me on my home phone, a lot. I would just pick my home phone up and call him. It was my company, I didn't mind.

Q. Do you have any telephone records of those?

A. We have some records of the company calling Tom.

\* \* \*

Q. Did you supply telephone records?

A. As a matter of fact we tried to supply you the phone records but the phone company does not produce them after a certain period of time and we let you know that.

\* \* \*

Q. So you don't have any record of when you called?

A. Of any of those I called?

Q. When you called concerning rejection.

A. A specific rejection?

Q. Of a specific rejection in August or September in the year 2000?

A. We may have that.

Q. You may have that?

A. Yes.

Q. Did you ever supply it to me?

A. Yes, you have the records of the phone calls that RAD made and I'm sure in October.

Q. I'm talking about the records of your phone calls.

A. My personal phone?

Q. Yes, sir.

A. You know I can't get those records.

More importantly, Mr. Strawder's letter dated December 12, 2000, in which he complained about the 242 units, does not expressly or impliedly refer to his August/September rejection call to Mr. Wilks. Mr. Strawder wrote:

> Hi Tom,
>
> How is everything? Hope life is good. Do you need any help spending your money? (Smile)
>
> **Tell you why I'm writing.** Please find enclosed one of the 200–plus holders of Rad Concepts, Inc. from our first shipment from you. **Please look at the top surface of the bar. Can you tell us why there are all of those scratches?** Lori checked most of the boxes of holders we received from you and all of them are like this. **Do you know what happened?** Are these permanent? Or can it be corrected? ... (Emphasis added)

The phrase **"Tell you why I'm writing"** followed by **"Please look at the top surface of the bar," "why there are all of those scratches,"** and **"Do you know what happened?"** clearly imply that Mr. Strawder was complaining about the scratch marks for the first time.

Finally, the December 12 letter does not expressly reject the 195 units. Although he demands an explanation about how the scratch marks occurred, nowhere does Mr. Strawder specify what he wants WPIC to do about the "mistakes" in the units. Indeed, Mr. Strawder does not state that RAD was then in the position of being unable to sell the units because of the scratch marks on the I–Beam bars. Only a week prior to Mr. Strawder's December 12 letter, RAD sent WPIC a payment of $1,000.00 toward the invoice for the 195 units. A hand-written memo sent along with the payment does not mention any problem with the cassette holders. It reads as follows:

HI SAM,

TELL TOM THIS IS A PARTIAL PAYMENT ON INVOICE # 14415. THANK YOU FOR YOUR PATIENCE. WE HOPE TO PAY THE REST AS SOON AS POSSIBLE.

SINCERLY, [sic]

LORI

### (b) Revocation of Acceptance

Maryland cases have recognized the right to revoke acceptance conferred upon the buyer by Section 2–608 of the Uniform Commercial Code. See Lynx, Inc. v. Ordanance [sic] Products, Inc., 273 Md. 1, 15, 327 A.2d 502 (1974); Hardy v. Winnebago Industries, Inc., 120 Md.App. 261, 272, 706 A.2d 1086 (1998); Champion Ford Sales, Inc. v. Levine, 49 Md.App. 547, 551–52, 433 A.2d 1218 (1981). To revoke an acceptance and avoid liability, the buyer must show that the defect substantially impairs the value of the goods. Md. Com. Law Code Ann. § 2–608(1).

The court finds that RAD failed to show that there was a defect on the x-ray cassette holders that substantially impaired the value of the product.

The question of whether there exists a defect that substantially impairs the value to the buyer is "one of fact, to be decided by the jury on the facts and circumstances of each individual case." Champion, 49 Md.App. at 554, 433

A.2d 1218. The Court of Special Appeals in *Champion* stated that "proof of substantial impairment requires more than the buyer's subjective assertion that the value of the product to him was impaired: it requires evidence from which the trier of fact, applying objective standards, can infer that the needs of the buyer were not met because of the nonconformity." *Champion,* 49 Md.App. at 554, 433 A.2d 1218.

In the instant case, Mr. Strawder admitted that he sold the cassette holders to RAD's customers, including Mr. Strawder's own employer, regardless of scratch marks on the I–Beam bars. He testifies as follows:

A. I picked up 195 plus 47 replacements in sealed boxes to take home to evaluate. My job at the company is to evaluate this product. I would take it home and look at it and look at it over and over and over again and then I made a decision on it.

Q. And what was your decision?

A. I rejected everything he's ever produced for me.

Q. Okay, you rejected, yet you sold some, 76 of them, didn't you?

A. I sure did, sir.

Q. You did sell them?

A. I sure did.

Q. Okay, and you even included sales to your own employer, right?

A. Yes, sir.

Q. You got money from them for it, is that correct?

A. I sure did.

In addition, Mr. Strawder admitted on cross-examination that only 3 out of the 76 units sold were returned to RAD, and the reasons for the returns were not related to any alleged defect. From such evidence, this Court concludes that the needs of the [sic] RAD were met because it was able to sell the units without any demonstrable loss due to any alleged defect.

In light of the foregoing, the court finds that RAD is liable for the balance due on Invoice No. 14415.

### VII.   Liability on the Contract for the 5,000 Units

*Issue Three:* Whether RAD is liable for the contract price for the 5,000 units?

It is undisputed that the parties are bound by the contract dated February 22, 2000, which contract imposed upon WPIC a duty to produce 5,000 x-ray cassette holders, provided that RAD approved the samples and finished units. RAD contends that WPIC materially breached the contract by (1) failing to produce any sample, (2) failing to obtain approval of any sample, (3) failing to notify RAD of the completion of 5,000 units, and (4) failing to continuously perform its duties. WPIC responds that it (1) sent out a sample, (2) obtained RAD's approval of the sample, (3) notified RAD of the completion of 5,000 units through WPIC's attorney, and (4) withheld the units because RAD repudiated the contract.

### Item (1)—Production of Sample

*Item (1)* is not in dispute because Ms. Kelvie and Ms. Mott both testified that a sample unit was sent by WPIC on September 11, 2000, and received by RAD.

### Item (2)—Approval of Sample

The testimony of Ms. Kelvie and Ms. Mott is in conflict over the approval of the sample. Ms. Kelvie stated that Ms. Mott approved of the sample and told Ms. Kelvie to proceed with the final run of 5,000 units. Ms. Kelvie then discussed with Ms. Mott the new amortization amount for the 5,000 units. Ms. Mott denied approving the sample and testified that she told Ms. Kelvie that Mr. Strawder would inspect the sample and get back to WPIC with his decision. Mr[.] Strawder also testified that he never approved the sample.

WPIC offered telephone records into evidence corroborating Ms. Kelvie's testimony that she called RAD and left a message and received a return call from Ms. Mott. WPIC's telephone records show that a call was made to RAD on

September 13, 2000, for 33 seconds. The telephone records of RAD show that a call was made to WPIC on September 14, 2000 for 2 minutes. Ms. Kelvie's description of the conversation indicates that it could have been completed within the 2–minute time frame.

Ms. Kelvie also made contemporaneous notes of her conversation with Ms. Mott. She wrote on RAD's July 17 letter that the sample had been approved and that the new tooling cost, after credit for the amount of such cost billed for the 195 units on August 31, was $62,465.00. While the date of the approval of the sample written by Ms. Kelvie is in error by one day, 9/15 instead of 9/14, such error does not vitiate the overall corroborating nature of this evidence.

More importantly, Mr. Strawder's December 12 letter contains language implying that Mr. Strawder was aware of Ms. Mott's approval of the sample and believed that WPIC had completed the 5,000 units, as follows:

> Tell you why I'm writing. Please find enclosed one of the 200–plus holders of RAD Concepts, Inc. from our first shipment from you. Please look at the top surface of the bar. Can you tell us why there are all of those scratches? Lori checked most of the boxes of holders we received from you and all of them are like this. . . . **Do you think that the others you have made up are damaged like this too?** [Emphasis added].

Because Mr. Strawder was writing the above letter to complain about scratch marks on the I–Beam bars from 242 units received on August 25, the only other units ordered by Mr. Strawder were the 5,000. As such, the phrase "**the others**" must refer to the 5,000 units. Moreover, the phrase "**the others you have made up**" indicates that Mr. Strawder was aware that approval for the final run of 5,000 units had been given and he believed that they had been produced. Finally, Mr. Strawder's question about the condition of the 5,000 units is consistent with the undisputed fact that he had not picked up any of the 5,000 units.

*Item (3)—Notice of Completion*

WPIC's telephone records support Mr. Wilks' testimony that WPIC attempted to contact RAD with respect to the completion of 5,000 units and payment on Invoice No. 14415. WPIC made calls to RAD in 2000 on 9/20, 9/21, 10/09, 10/10, 10/27, 10/30, 11/1, 11/2, 11/29, and 12/18 and in 2001 on 1/03 and 2/05. Furthermore, Mr. Bernstein's letter to Mr. Strawder expressly stated that the 5,000 units were ready to deliver. Thus the court finds that WPIC did not fail to notify RAD of the completion of the 5,000 units.

***Item (4)—Reasonable Grounds to Suspend Performance***

***Item (4)*** is concerned with an anticipatory repudiation by the buyer and the seller's right to adequate assurance of performance under the Uniform Commercial Code. Md. Com. Law Code Ann. §§ 2–609(1) & 2–610. Section 2–609(1) of the Commercial Law Article provides that "when reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return." Comment 2 of Section 2–610 of the Commercial Law Article states that "a repudiation automatically results ... when a party fails to provide adequate assurance of due future performance within thirty days after a justifiable demand therefor has been made." Further, Comment 1 of Section 2–610 provides that when a repudiation substantially impairs the value of the contract, "the aggrieved party may at any time resort to his remedies for breach, ... " Therefore, the analysis for Item (4) encompasses three parts: (a) whether WPIC had reasonable grounds for insecurity so as to justifiably demand adequate assurance of due performance; (b) if so, whether RAD failed to provide adequate assurance so as to constitute a repudiation; and (c) if RAD is found to have repudiated, whether RAD's repudiation substantially impaired the value of the contract to WPIC. *See* Md. Com. Law Code Ann. § 2–610, Comment 2.

***(a) Reasonable grounds***

WPIC claims that it had reasonable grounds for insecurity so as to justifiably demand adequate assurances from RAD. Mr. Bernstein's letter dated January 25, 2001, to RAD reads:

> ... WPIC has every reason to question RAD's ability and intentions with regard to payment. Therefore, you must provide *actual payment or assurances acceptable to WPIC* that the amounts due will be paid within a time certain which is acceptable to WPIC ... [Emphasis added].

"[A] buyer who falls behind in 'his account' with the seller, even though the items involved have to do with separate and legally distinct contracts, impairs the seller's expectation of due performance." Md. Com. Law Code Ann. § 2–609, Comment 3. In the instant case, RAD picked up 195 units without paying and was allowed to postpone payment until it sold and collected money from its customers. While RAD sold 39 units as of January 1, 2001, which sales generated revenue of $9,711.00, RAD paid only $1,000 toward the invoice for the 195 units. Moreover, as indicated above, Mr. Wilks made many attempts to contact Mr. Strawder regarding payment for the 195 units. This court finds that WPIC had reasonable grounds for insecurity because of RAD's payment history and avoidance of telephone calls and WPIC could demand "actual payment or assurances acceptable to WPIC." As such, WPIC could suspend further performance of the contract until payment or acceptable assurances were received from RAD.

*(b) Repudiation*

WPIC claims in its Proposed Findings of Fact and Conclusions of Law that Mr. Strawder verbally repudiated the contract during his telephone conversation with Mr. Wilks on February 5, 2001. Mr. Wilks testified as follows:

Q. Now, did there come a time subsequently when you had a telephone conversation with Mr. Strawder?

A. Yes.

Q. When was that?

A.  February 5, 2001.

Q.  And what was the nature of that call?

A.  It was a scream call.  It was a scream session.

Q.  Who was screaming at who?

A.  Oh, we were both getting into it.

Q.  Okay, and as a result of that scream call, what, if anything, did Mr. Strawder say to you?

A.  He said he would never buy any of the trash that we produced, implying that the product we had on our floor was our product.  That he was never going to buy it.

This court finds that RAD repudiated the contract not only because of Mr. Strawder's statement to Mr. Wilks set forth above, but because of RAD's failure to provide actual payment or assurances with respect to the 5,000 units.  Mr. Strawder wrote three letters to WPIC, including the two to Mr. Bernstein.  Nowhere in these letters did Mr. Strawder state his intent with respect to the 5,000 units.  While Mr. Strawder unilaterally offered in his February 5, 2001 letter to make installment payments toward Invoice No. 14415, nowhere in that letter did Mr. Strawder make any promise of payment or other assurance with respect to the 5,000 units.  Therefore, this court finds that Mr. Strawder's statement refusing to purchase the 5,000 units and RAD's failure to provide payment or adequate assurances regarding those units constituted a repudiation.

### (c) Substantial impairment of value

As to substantial impairment of value, the test is whether "material inconvenience or injustice will result if the aggrieved party is forced to wait and receive an ultimate tender minus the part or aspect repudiated." Md. Com. Law Code Ann. § 2–610, Comment 3. RAD's position throughout the trial has been that it categorically denies any liability on the contract dated February 22, 2000. In his February 20, 2001 letter to Mr. Bernstein, Mr. Strawder stated that "[w]e believe that we do not owe 'Wilks' any money yet." However, at that time WPIC had already

completed the production of all 5,000 units based upon Mr. Strawder's approved sample. WPIC's expert witness, John Galuardi, testified that the x-ray cassette holder produced by WPIC as a part of the 5,000 unit order met industry standard. The I–Beam bar from this order did not have the "scratches" that Mr. Strawder complained about regarding the 242 units received in August. Moreover, at the time of Mr. Strawder's February 20 letter, WPIC had not been paid for any of the costs of producing the 5,000 units, including two steel molds. Thus this court finds that material inconvenience or injustice will result if RAD is permitted to repudiate all of the 5,000 units produced by WPIC under the February 22, 2000 agreement.

In sum, this court finds that WPIC had reasonable grounds for insecurity to demand adequate assurances from RAD and suspend its performance until such assurances were received from RAD, that Mr. Strawder's statement and RAD's failure to respond to WPIC's request for adequate assurances constituted a repudiation, and that such repudiation substantially impaired the value of the contract to WPIC. Therefore, RAD breached the contract of February 22, 2000.

### VIII. RAD's Amended Counterclaim

In its amended counterclaim and Proposed Findings and Conclusions of Law, RAD contends that WPIC materially breached the February 22, 2000 contract in many ways. This court has addressed the most significant of those contentions and found them to be without merit. This court finds that there is insufficient credible evidence to support any of RAD's remaining allegations of breach of contract on the part of WPIC.

RAD claims that it was over billed on Invoice No. 14415 and that WPIC's failure to correct such errors renders the invoice unenforceable. This claim is without merit. Any error in the amounts charged in Invoice No. 14415 affects only the amount of damages due to WPIC, not RAD's liability therefor.

WPIC has admitted in its Proposed Findings of Fact and Conclusions of Law, page 5, paragraph 18, that there are errors in each of the Invoices submitted to RAD. RAD disputes the amount of such errors. A resolution of this controversy will be achieved either by the parties or by the court at a trial on damages.

Accordingly, at the conclusion of this case, a judgment will be entered in favor of WPIC and against RAD on RAD's amended counterclaim.

### IX. Conclusion

For the aforementioned reasons, WPIC is entitled to recover the balance due on Invoice No. 14415 for 195 units and the full contract price on the February 22, 2000 agreement for 5,000 units.

Insofar as damages are concerned, this Court was not asked to decide the amount of damages to be awarded. In this trial, both parties have contested only the adjudication of liability, not the amount of judgment. The parties will have sixty (60) days from the date of this Memorandum Opinion to agree upon the amounts due from RAD to WPIC. If an agreement is not achieved within said time frame, a trial on damages will be scheduled before the undersigned judge.

After finding for WPIC, the court denied RAD's request for reconsideration.

Pursuant to the court's Memorandum Opinion addressing damages and the parties' stipulation of damages, the court entered a Stipulation and Order, and judgment on a separate document on April 7, 2005, for Wilks and against RAD in the amount of "$119,142.10 plus interest at the legal rate computed from the date of judgment and the costs of the proceeding"—under Invoice 14327, $141.00; under Invoice 14415, $3,120.35; and under Invoice 1144, $115,880.75. The court also ordered the claims of RAD "and the counterclaims of Counter–Claims [Appellant] RAD be and they are dismissed." RAD's timely appeal to this Court followed.

## LEGAL ANALYSIS

Appellant challenges the court's application of Commercial Law Article § 2–609 and its reliance on § 2–610, Comment 3 in finding that RAD statutorily repudiated the contract by failing to provide adequate assurance of due performance. RAD also assigns error to the court's finding that, in addition to the repudiation by statute, Strawder repudiated the contract with WPIC in his telephone conversation with Wilks on February 5, 2001. Because WPIC committed "major breaches" in August 2000, October 2000, on January 25, 2001 and February 1, 2001, which "rendered Contract #1 impossible of performance long before February 5, 2001," RAD argues that judgment should be entered against WPIC for breach of contract and that RAD be "given the opportunity to prove its damages."

## STANDARD OF REVIEW

When, as in the case at bar, an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. *See Maryland Rule* 8–131(c) (2005). "It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* Upon our review of the law and evidence of this matter, we conclude that the court did not err, nor did it abuse its discretion in making its findings or reaching its legal conclusions. Because we also hold that WPIC did not breach any contract it had with RAD, we shall affirm the decision of the lower court.

### A.  ALLEGED BREACH OF CONTRACT BY WPIC

RAD claims in issues I and II that the court should not have found that it repudiated Contract #1 because WPIC had previously committed "major breaches" of the contract. Particularly, RAD alleges WPIC breached the contract by demanding immediate payment for production of the cassette holder units and, its failure to provide a sample for approval

before production of the 5,000 units, is proof of WPIC's breaches of contract, rendering Contract #1 void and entitling RAD to damages. RAD also cites to *Shapiro v. Massengill,* 105 Md.App. 743, 757, 661 A.2d 202 (1995), in support of its assertion that WPIC committed a material breach that "relieve[d]" RAD "from the duty of performance" and these breaches affected "the purpose of the contract in an important or vital way." [3] Upon our review of the facts and the law, we hold that WPIC did not breach Contract #1.

■ WPIC's duty under Contract #1 was to construct the molds and tooling for the cassette holder units—a duty it satisfied. The primary issue that led to a breakdown between the parties was WPIC's belief that it would not get paid. The parties drafted a second contract for additional units in August of 2000, for which WPIC received one payment of $1,000, months after the September 30, 2000 due date. The court found, based upon sufficient evidence within the record, that RAD picked up the units under Contract #2 upon completion, resold some of the units to customers, and did not complain to WPIC about the products' quality until December of 2000.

During this time, Mott, Vice President of RAD, approved a sample unit that was to be part of RAD's request for 5,000 cassette holders. As WPIC worked toward producing the product, it is clear WPIC became concerned that RAD would not pay under Contract #1 because RAD had not paid under Contract #2 by January 2001, fostering WPIC's apprehension. There were also several failed attempts to contact RAD in reference to payment, which ultimately led to the February 5, 2001 telephone call whereby RAD repudiated the contract. According to RAD's brief, it maintains that the "creative financing" agreement is controlling in that no money should be due to WPIC because of the special financing arrangement.

---

**3.** RAD cites language from *Shapiro* where this Court quoted instructions to the jury from the trial court that included this language. The case is inapposite because RAD refers to dicta in the opinion where we listed jury instructions, and our discussion and holdings in *Shapiro* did not encompass any principles related to this case.

Md.Code. (2003 Repl.Vol., 2005 Supp.), Com. Law I, § 2–709(1)(a), nevertheless, provides that, "[w]hen the buyer fails to pay the price as it becomes due the seller may recover . . . the price of goods accepted. . . ."

Regardless of the "creative financing" arrangement, WPIC demanded payment as a result of RAD's failure to pay under Contract #2. RAD, in response, urges that failure to pay in one contract should not affect the provisions of the other. That argument is inconsistent with the fact that RAD accepted—and approved of—the units when it took the units constructed under Contract #2. It is also reasonable for the court, examining the evidence in the light most favorable to WPIC, that it would be justifiably insecure if RAD could not pay for 195 units over a few months, when the request for 5,000 units was in the process of being filled.

RAD also underscores WPIC's demand for payment set forth in a letter sent by WPIC's attorney. The attorney sought "actual payment or *assurances acceptable to WPIC* that the amounts due" would be paid. Considering that RAD included arrangements in its response to pay the balance under Contract #2, it could have made similar proposals for payment of Contract #1, or inquired as to what assurances would be acceptable to WPIC; it did neither. We hold that the only breach of contractual duty was committed by RAD. Consequently, we conclude that the court did not err in rejecting RAD's claim that WPIC materially breached Contract #1.

With respect to the sample approval, there was contested testimony regarding approval made by RAD's Vice President Mott. In support of the assertion that RAD approved the sample, the court found, as we shall also conclude, that the evidence submitted by WPIC documenting a WPIC shipping invoice noted that a cassette holder was shipped to RAD "for evaluation" on "9/11/00." There were, in addition, telephone calls three days later between Kelvie and Mott, and Kelvie's notes confirmed the conversation corroborating WPIC's asser-

tion that RAD approved the sample of the 5,000 units on September 14, 2000.

RAD also points to evidence that suggested that WPIC began production of the 5,000 units on August 23, 2000, before RAD's approval. We agree, however, with the position advanced by WPIC that the commencement of production does not constitute a breach of Contract #1, in view of the fact that WPIC was performing pursuant to its agreement. Had appellant effectively rejected or disapproved of the sample, it would have been WPIC's loss and its problem to resolve the nonconforming units. We, therefore, hold that, because the evidence is clear that RAD approved of the sample, WPIC did not breach Contract #1 by not getting RAD's approval or beginning production prior to approval.

## B. COMMERCIAL LAW APPLICATION

RAD argues, in issues III and IV, that the court erred in finding that it repudiated Contract #1 for the 5,000 units during a telephone conversation between Strawder and Wilks on February 5, 2001. RAD claims that, assuming that Strawder's statement that he would not purchase the "trashes" WPIC created did amount to a repudiation of the contract, he retracted the statement, pursuant to Commercial Law Article § 2-611, on the same day by way of a letter to WPIC's attorney, which stated in part:

> I also can't figure out why Tom has gotten [the WPIC attorney] involved so fast. And I don't know why you are saying that we owe "Wilks" payment for 5,000 holders right now. The amount of money past due that Tom mentioned on the phone today was $1,500.00. I told Tom that I thought we had agreed over the phone months ago to pay the late interest charges on this overdue amount. We have never received a statement about making payment on these interest charges from Tom and have spoken with him on more then [sic] one occasion about it again. I still don't understand why Tom has gotten you involved for such a

small debt instead of a collection company better yet why didn't he just send us the bill, call us or write us a letter.

I am making arrangement for payment of the $1,500.00. *[RAD] can make a minimum payment of $150.00 (one hundred & fifty dollars) per month until this debt is exhausted. We will make a larger payment as soon as sales improve. Starting date for the first payment is March 1, 2001.*

*It is Rad Concepts, Inc. desire to continue doing business with Wilks. We cannot afford to stop filling orders now. We cannot close shop now. Tom [Wilks] knows this I'm sure. It would not be fair to a new product to not be able to continue at this point.*

(Emphasis added).

The trial judge in this case had the opportunity to sit as the trier of fact and observe the witnesses' demeanor. We hold that the trial judge committed no error, and did not abuse his discretion in finding repudiation on the part of RAD.

Commercial Law Article § 2–611 provides:

(1) Until the repudiating party's next performance is due he can retract his repudiation *unless the aggrieved party has since the repudiation cancelled or materially changed his position or otherwise indicated that he considers the repudiation final.*

(2) Retraction may be by any method which clearly indicates to the aggrieved party that the repudiating party intends to perform, but must *include any assurance justifiably demanded under the provisions of this title (§ 2–609).*

(3) Retraction reinstates the repudiating party's rights under the contract with due excuse and allowance to the aggrieved party for any delay occasioned by the repudiation. (Emphasis added.)

Md.Code (2003 Repl.Vol., 2005 Supp.), Com. Law I, § 2–611.

It is undisputed that Strawder stated his unwillingness to continue with Contract #1. The record evidence is sufficient to demonstrate repudiation, given the trier of fact's duty to

weigh the evidence. We next consider whether that unequivocal repudiation was retracted. As stated in subsection (1) above, RAD could retract Strawder's statement refusing to purchase the 5,000 units to which it was contractually bound, so long as WPIC did not materially change its position or consider RAD's refusal to perform final. Despite appellant's effort to retract its statement and maintain business relations with WPIC, it is clear that WPIC, as the aggrieved party, materially changed its position after that telephone conversation. WPIC submitted its invoice for payment for the balance due on Contract #1, received by RAD five days after the telephone conversation on February 5, 2001. Section 2-611(2) also requires that the purported retraction must include adequate assurances. Strawder's letter does not comply with § 2-611. He offered a payment plan for the contract for the 242 additional units, but stated nothing with respect to Contract #1. Assuming, *arguendo*, that he was alluding to Contract #1, WPIC had the option to deem RAD's offer to pay $150 per month for the overall debt of all units as an inadequate assurance. Viewing the evidence in the light most favorable to WPIC, we hold that the court did not err in finding that RAD repudiated Contract #1.

Appellant asserts in issues V and VI that the circuit court erred in relying upon Commercial Law Article §§ 2-609 and 2-610 and the respective Comments to these sections. Specifically, RAD claims that the demand letter from WPIC's counsel was not written in compliance with § 2-609, and that the "creative financing" to which the parties agreed did not make the balance due. The pertinent statutory sections provide:

§ 2-609. Right to adequate assurance of performance

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if

commercially reasonable suspend any performance for which he has not already received the agreed return.

(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

§ 2–610.   Anticipatory repudiation

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

(a) For a commercially reasonable time await performance by the repudiating party;  or

(b) Resort to any remedy for breach (§ 2–703 or § 2–711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction;  and

(c) In either case suspend his own performance or proceed in accordance with the provisions of this title on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (§ 2–704).

Md.Code (2003 Repl.Vol., 2005 Supp.), Com. Law I, §§ 2–609, 2–610.

■■  Because application of the provisions of the Uniform Commercial Code is often fact-based, a trial court has discretion as to how to interpret and apply the laws of the Commercial Code. The Court of Appeals reiterated the manner in which appellate courts should analyze commercial laws, with guidance from the Official Comments:

Although we are directed by the General Assembly to construe the Uniform Commercial Code in a manner which "make[s] uniform the law among the various [states]" adopting it, Md.Code (1975), Commercial Law Art., §§ 1–102(1), – 102(2)(c), we nonetheless utilize, in interpreting the Code, the same principles of statutory construction that we would apply in determining the meaning of any other legislative enactment. These well settled principles require ascertainment of the legislative intent, and if, as is the case here, construction becomes necessary because the terminology chosen is not clear, then we must consider not only the significance of the literal language used, but the effect of our proposed reading in light of the legislative purpose sought to be accomplished. Unlike most state statutory enactments, the U.C.C. is accompanied by a useful aid for determining the purpose of its provisions—the official comments of the Code's draftsmen. While these comments are not controlling authority and may not be used to vary the plain language of the statute, they are an excellent place to begin a search for the legislature's intent when it adopted the Code.

*Messing v. Bank of America, N.A.,* 373 Md. 672, 684–85, 821 A.2d 22 (2003) (quoting *Jefferson v. Jones,* 286 Md. 544, 547–48, 408 A.2d 1036 (1979)). *See also Lema v. Bank of America, N.A.,* 375 Md. 625, 638, 826 A.2d 504 (2003) (noting the usefulness of the UCC official comments).

The court, in its application of the pertinent legal principles to the facts of this case, did not err in its findings or abuse its discretion. RAD notes that the court correctly found that the "parties entered [into] two separate contracts—one for 195 cassette holder units [in August of 2000] and the other for 5,000 units [in February of 2000]." RAD, nevertheless, argues, unconvincingly, that its failure to pay under the August contract cannot and should not be viewed in conjunction with its ability to perform, *i.e.,* pay for the 5,000 requested units under the February contract, Contract #1.

■ The circuit court delineates the reasons why it found RAD liable on the August contract for 195 units, thereby imposing the responsibility of performance for payment upon RAD. The court explained that it found RAD accepted these units by "acting in a manner inconsistent with seller's ownership," in accordance with Commercial Law Article § 2–606(1)(c),[4] when RAD took possession of the units on August 25, 2000, without payment, and began to sell and ship the units to customers on August 28, 2000. The court also found that RAD failed to effectively reject the units despite having a reasonable opportunity to inspect. *See* Md.Code (2003 Repl. Vol., 2005 Supp.), Com. Law I, § 2–606(1)(b). Additionally, Strawder complained in correspondence to WPIC about scratches in December of 2000, after units had been sold, but failed to present any evidence of an effective rejection.

Significantly, the court also found that RAD did not prove by a preponderance of the evidence that there was a defect in any of the units that substantially impaired the value of the x-ray cassette holders, which would have allowed RAD to revoke its acceptance. *See* Md.Code (2003 Repl.Vol., 2005 Supp.), Com. Law I, § 2–608(1) (stating "[t]he buyer may revoke his acceptance of a ... commercial unit whose nonconformity substantially impairs its value to him if he has accepted it.") The court noted that, because only three units out of seventy-six were returned to RAD, and not due to an alleged defect, the units clearly did not contain a defect that substantially

---

**4.** Md.Code (2003 Repl.Vol., 2005 Supp.), Com. Law I, § 2–606 provides in full:

    (1) Acceptance of goods occurs when the buyer

    (a) After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

    (b) Fails to make an effective rejection (subsection (1) of § 2–602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

    (c) Does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

    (2) Acceptance of a part of any commercial unit is acceptance of that entire unit.

impaired their value. With respect to RAD's failure to pay under this contract, the parties agreed that RAD would pay by January 1, 2001, or have interest applied to the unpaid balance. In the meantime, RAD was to submit $150 per month until the debt was satisfied, a requirement with which RAD did not comply, except for a payment of $1,000 in December of 2000. We hold that these findings are all based upon reasonable inferences that the trial judge, as trier of fact, was able to make in evaluating the evidence.

Comment Three of § 2–609, on adequate assurance of performance, provides in pertinent part:

> Under commercial standards and in accord with commercial practice, a ground for insecurity need not arise from or be directly related to the contract in question. The law of "dependence" or "independence" of promises within a single contract does not control the application of the present section.

> Thus a buyer who falls behind in "his account" with the seller even though the items involved have to do with separate and legally distinct contracts, impairs the seller's expectation of due performance. . . .

Md.Code (2003 Repl.Vol., 2005 Supp.), Com. Law I, § 2–609, Comment Three.

■ The record clearly discloses that the court made the rational inference and came to the proper legal conclusion that WPIC had reasonable grounds for insecurity, as required under § 2–609 and Comment Three, that RAD would not perform under the February 2000 contract and submit proper and timely payment for the 5,000 units, and was therefore justified in demanding assurances. The evidence revealed, when viewed in a light most favorable to WPIC, that "[w]hile RAD sold 39 units as of January 1, 2001, which sales generated revenue of $9,711.00, RAD paid only $1,000 toward the invoice [14415 requesting for the 195 units $4,607.85]." RAD contends that, because WPIC's lawyer did not refer to or mention Contract #1 in the demand letter, § 2–609 did not apply. There is, however, the letter referring to the complet-

ed units, as well as the attorney's request that RAD "provide actual payment or assurances acceptable to WPIC that the amounts due will be paid within a time certain which is acceptable to WPIC." There is no doubt that a reasonable trier of fact would conclude that WPIC was demanding adequate assurances pursuant to § 2–609. Moreover, RAD, after repudiation, did nothing to effectively retract repudiation except offer payment for the August 2000 contract and rely upon the "creative financing" agreed to at the inception of the contract. RAD, however, wrote a letter to complain about scratches on the August 2000 holders, and referred to "the other units," demonstrating its awareness of WPIC's work on the 5,000 other units to be completed.

WPIC presented additional justification for its demand of adequate assurances of performance from RAD. Lei Fong Koo, testifying on behalf of WPIC, explained that, in his prior business dealings with RAD, his company, Metro Tool and Manufacturing Corporation, prepared molds for x-ray trays, drawings and a tray sample for RAD. Koo noted that his company created and modified the molds as requested by RAD and "sent out parts to the hospitals" pursuant to his company's contract with RAD. When asked whether he was ever paid for his work, he responded that he was not paid. Koo's testimony, coupled with RAD's actions under Contract # 2, demonstrates WPIC's substantial justification in demanding assurances.

Because we hold that the court properly applied § 2–609 to the facts in this case, it follows that it did not err or abuse its discretion in applying § 2–610. Section 2–609(4) specifically states that "[a]fter receipt of a justified demand failure to provide within a reasonable time ... assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract." Once RAD failed to effectively retract its repudiation or provide assurances adequate to WPIC, its repudiation remained, requiring the court to invoke § 2–610, which sets forth the steps an aggrieved party may take in the event of an anticipatory repudiation. Further, the court accurately applied the substantial

value test, articulated in Comment Three of § 2–610, and found that a "material inconvenience or injustice" would result if WPIC was "forced to wait and receive an ultimate tender minus the part or aspect repudiated." Md.Code (2003 Repl. Vol., 2005 Supp.), Com. Law I, § 2–610, Comment Three. Consequently, we reject RAD's claims that the court erred in its application of Commercial Law Article §§ 2–609 and 2–610 to reach its conclusions.

## C. THE CASE LAW

■ In support of its claim that the court erred in its reliance upon the principle of repudiation because WPIC failed to accept RAD's alleged repudiation, RAD directs us to the decision of the Court of Appeals in *Fast Bearing Co. v. Precision Development Co.* 185 Md. 288, 308–10, 44 A.2d 735 (1945):

> This Court said 'The general rule with respect to contracts is generally stated to be that, when the impossibility of performance arises after the formation of the contract, the failure of the promisor to perform is not excused ... upon the theory that, if the promisor makes his promise unconditionally, he takes the risk of being held liable even though performance should become impossible by circumstances beyond his control.... The unfair consequences of this rule resulted in exceptions when the impossibility arises (1) either from a change in domestic law or by an executive or administrative order....' In that case there was quoted with approval, Restatement of the Law of Contracts, Volume 2, page 852, Section 458, where it is stated 'A contractual duty ... is discharged ... where performance is subsequently prevented ... (a) by the Constitution or a statute of the United States ... (b) by a judicial, executive or administrative order made with due authority by a judge or other officer of the United States....'
>
>       * * *
>
> The sale of the specially designed machinery and the tools and raw steel, mentioned as another breach of the contract,

might be evidence that Precision did not intend to manufacture Fast bearings, although it did manufacture those on which the judgment allowed royalties. However, such sale did not prevent compliance with the contract, because, as we have shown, compliance was prevented by the orders of the Navy. The letter of April 19, 1943, giving Fast notice of an intention not to go further with the manufacture of its bearings, was not accepted as a cancellation, or as a basis for cancellation. Fast, through its attorney, replied to this letter and insisted that Precision carry out its obligation under the agreement. But at that time, and up to the bringing of this suit, Precision could not produce bearings because of the Navy. A question suggested by the sale of machinery and steel and from the letter of April 19, 1943 is whether they give a basis for a suit for anticipatory damages. *It has been generally held in this country that before a plaintiff can rely on an anticipatory breach in order to recover prospective damages, he must accept the repudiation of the contract as such. Friedman v. Katzner,* 139 Md. 195, 114 A. 884; Williston on Contracts, Revised Edition, Vol. 5, page 3722; *Hennessy v. Bacon,* 137 U.S. 78, 11 S.Ct. 17, 34 L.Ed. 605; *U.S. Potash Co. v. McNutt,* 10 Cir., 70 F.2d 126 and cases cited. That the plaintiff failed to do in this case. (Emphasis added.)

Appellant also cites *C.W. Blomquist and Co., Inc. v. Capital Area Realty Investors Corp.,* 270 Md. 486, 494, 311 A.2d 787 (1973), and emphasizes that, for the lower court here to have found repudiation, RAD's alleged repudiation needed to be a "definite, specific, positive and unconditional repudiation of the contract."

Upon our review of these cases, neither is applicable to the instant case. In *Fast Bearing,* Petitioner brought suit against Precision for its alleged breach for not manufacturing oil film bearings pursuant to its contract with Fast Bearing. *Fast Bearing,* 185 Md. at 290, 44 A.2d 735. The case is inapposite to the case *sub judice* in that Precision did not produce the bearings pursuant to orders from the United States Navy not to perform under its contract. *Id.* at 292, 44 A.2d 735. The

breach here, however, did not prevent WPIC from completing production of the x-ray cassette holders. In addition, RAD focuses on one point, *i.e.*, that WPIC must "accept" repudiation before it could seek to recover damages. As noted above, it is evident that WPIC "accepted" RAD's decision to repudiate, whether by telephone or by failing to convey adequate assurances of payment for Contract #1, because it requested payment five days after the telephone conversation. For purposes of § 2–611, WPIC certainly had a material change in its position and considered RAD's repudiation final because RAD's letter of "retraction" did not suffice for WPIC to resume performance under its contractual relationship with RAD.

In *C.W. Blomquist*, the Court of Appeals held that Blomquist did not sufficiently prove that Capital, a realty company, did not repudiate its land settlement contract with Blomquist, but it was Blomquist who repudiated by sending a letter to respondent requesting the contract be cancelled. *C.W. Blomquist*, 270 Md. at 496, 311 A.2d 787. The *Blomquist* case fails to support RAD's claims because the repudiation here, as well as the one in *Blomquist*, was definite and specific. Strawder expressed his intention not to pay for the 5,000 units and RAD did not provide adequate assurances to WPIC that it could pay for the 5,000 units. WPIC's attempt to secure payment for all units demonstrates its interpretation and understanding of RAD's actions with respect to the contracts.[5] Although WPIC performed its duty to construct the units, WPIC had

---

5. In its reply brief, RAD cites *Blomquist* for the proposition that WPIC failed, as "the other party," to make its intent known, by way of "election," to "treat the contract as abandoned." *C.W. Blomquist*, 270 Md. at 494, 311 A.2d 787 (quoting *Weiss v. Sheet Metal Fabricators*, 206 Md. 195, 203–04, 110 A.2d 671(1955)). This proposition is also inapplicable to the instant case in that WPIC, after accepting RAD's repudiation of the contracts, *elected* to demand payment or assurances for its services under the contracts. When RAD failed to do either, WPIC then *elected* to file suit for breach of contract. WPIC's actions thereby evidenced its intent not to complete its performance and thus to abandon the contract, since it had partially performed, but had refused to allow RAD to abandon its duty to pay under the contracts.

justifiable doubts that RAD would not perform its duty to pay, since it had failed to pay under Contract #2.

## D. APPROVAL OF UNITS AND INDUSTRY STANDARDS

█ In issue VII, RAD contends that the court erred when it found that the 5,000 units under Contract #1 met the "contract requirement," despite the fact that RAD was denied its right to "approve or disapprove the 5,000" units and despite the fact that WPIC admitted to a "cosmetic problem" with the units. RAD argues that the court's finding that RAD was liable for the 5,000 units was erroneous because WPIC did not submit a sample before production began. We disagree.

RAD misconstrues the court's finding. It posits that, because it did not specifically, and expressly, approve or disapprove of the sample, the court erred in denying RAD its contractual right to approve. The court, however, found that RAD did approve of the units in Contract #1 in accepting the units under the State Commercial Code. The units from Contract #1 were the same units in August of 2000, with minor differences in the molds and size of screws, constructed in accordance with Contract #2. Additionally, RAD sold some of these units and did not express any dissatisfaction about the units until December of 2000.

Moreover, although there was conflicting testimony regarding approval received by Kelvie from RAD's Vice President Mott, the evidence—telephone calls on September 14, 2000, between Kelvie and Mott, Kelvie's notes about the conversation, an undisputed WPIC shipping invoice that noted a cassette holder was shipped to RAD "for evaluation" on "9/11/00," plus Strawder's references in his December 12th letter—corroborated WPIC's assertion that RAD approved the sample of the 5,000 units on September 14, 2000.

With respect to the commercial reasonableness of the units, the court discussed the testimony of WPIC's witness, John Galuardi, an expert in the area of physics and the manufacture of plastic molded parts. He testified that, in his opinion as an

expert, the WPIC models that he observed were "on par for an injection molded part," and in comparison to European countries, was "on par or even a notch above, ... the Hungarian [injected molded parts.]" RAD cross-examined Galuardi, but did not counter his testimony with an expert who would have testified otherwise. We conclude that RAD's approval, in conjunction with WPIC's expert testimony, demonstrates that the cassette holder units met industry standards and were commercially reasonable in accordance with Commercial Law Article § 2–609.

## E.  ADDITIONAL ISSUES

### 1.  Damages

Although RAD did not present the following issues with the others discussed above, we shall address them here. Appellant argues that it is entitled to a trial on the issue of damages because the court erroneously found in favor of WPIC, leaving RAD without an opportunity to prove its damages. RAD had filed a proposed pre-trial order in which it agreed to allow the court to conduct a trial on the sole issue of liability. The court signed and entered the order. In addition, despite the court's ruling in WPIC's favor, it stated at the conclusion of its Memorandum Opinion that, if the parties could not agree to damages to be paid to WPIC, the court would have conducted a trial on that specific issue.

RAD clearly had ample opportunity to prove its counter-claim against WPIC, alleging that WPIC was the breaching party in this case and that, because of WPIC's "major breaches," RAD deserved damages. The circuit court, however, heard all of the allegations, evaluated the evidence, observed the witnesses, weighed their credibility, and "found [RAD's claims] to be without merit." Although the court found in WPIC's favor, thus entitling it to damages, RAD had an opportunity to affect a reduction in the amount of damages it would be required to pay to WPIC under a judgment had it chosen to go to trial after liability was determined. Instead, it chose to stipulate to the damages. Because we have held that

the court did not err in its findings or conclusions, we will not disturb its findings to give RAD a hearing on damages—damages that the court found that RAD did not suffer.

## 2. WPIC's Demand Letter

RAD insists that the court did not discuss its "main contention" that, because WPIC's demand letter requested more than Contract #1 called for, this was a "major breach that ended the contract." The fact that WPIC made this demand before any product was supplied was also claimed to be a breach. As stated above, we agreed with the lower court and held that WPIC did not breach Contract #1 as alleged by RAD. We also reject RAD's argument that the court did not address RAD's contention. It simply did not accept RAD's argument. Had the court found that WPIC demanded more than it was entitled to under Contract #1 and, had its demand gone beyond the contract, the court would have been bound by Comment Two of § 2–610 to find that it repudiated the contract.[6] WPIC merely requested the cost of the molded parts for each unit listed as $10.63/set ($53,150), plus the adjusted amortization charge for each set at $13.00 from $12.59 in Contract #1 ($65,000) for a total demand of $118,150.00.[7]

RAD cites to passages from its Opening Statement, its Closing Argument and its exchange with the court. RAD sets forth one legal citation and conclusory statements under this section without any legally cognizable argument. Because the

---

6. Md.Code (2003 Repl.Vol., 2005 Supp.), Com. Law I, § 2–610, Comment Two provides in pertinent part that:

   Under the language of this section, a demand by one or both parties for more than the contract calls for in the way of counter-performance is not in itself a repudiation nor does it invalidate a plain expression of desire for future performance. However, when under a fair reading it amounts to a statement of intention not to perform except on conditions which go beyond the contract, it becomes a repudiation.

7. We note that invoice 1144 requesting payment for the 5,000 units lists the total for the cassette holders incorrectly as $52,150.00. It should read "$53,150.00."

passages and conclusions set forth by RAD offer nothing by way of legal argument, we decline to address the issues as presented "but not argued." *Federal Land Bank of Baltimore, Inc. v. Esham,* 43 Md.App. 446, 457–58, 406 A.2d 928 (1979) (citations omitted). *See also Md. Rule* 8–504(a)(5).

For the reasons stated herein, we shall affirm the decision of the lower court.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**